# Candor's Appeal.

A child is not entitled to recover wages for services rendered, from the estate of his deceased parent, unless upon clear and unequivocal proof, leaving no doubt that the relation between the parties was not the ordinary one of parent and child, but of master and servant.

APPEAL from the decree of the Orphans' Court of *Union* county.

Robert Candor, as the administrator of his father, Josias Candor's estate, presented his account to the Orphans' Court, in which he prayed to be allowed a credit of $1550 for work, labour and services rendered to his father in his lifetime, while he was living with him as a member of his family and after he arrived at full age. This was objected to by the other heirs, and the court referred the subject to an auditor, who on this subject made the following report:

The exception (on credit side) is, that " the credit for $1550, for work done from January 1st 1825 to July 1st 1840, fifteen years and six months, ought not to be allowed." Under this exception, it was contended in the first place, that the credit was wrong in toto and could not be sustained in law, and in the second place, that if the administrator was entitled to any credit at all for his services as stated, $1550 was greatly too much. If

the credit is proper in itself, I am clearly of opinion that it is not too high.   With reference to this exception, as well as the ones last disposed of, the neighbours who knew the services and the circumstances under which they were rendered were called, and swore that they believed it nothing more than a reasonable compensation.   The next inquiry then is, can the credit be sustained at all?   I will briefly refer to the evidence bearing on this point. Charlotte C. Strawbridge swore, " that her father had not attended to any business for upwards of fifteen or twenty years before his death: that Robert attended to his business generally; that her father at one time was paying some money to her brother Thomas, when the witness observed to him, that he was still giving money to the rest and none to Robert, who, she thought, deserved it most; that her father then replied, that Robert was at home and did not need money, but if he were going off, he would give him some too; that she had further remarked, that Robert was doing a great deal, managing for the family, and that her father then replied, ' he shall be paid, or he may lay in for wages; that he should be compensated,' or words to that amount; that this was about ten years ago."   John Koch swears, " that in a conversation he had with the intestate in June 1839, he had observed to him that Robert attended to his business; that he attended to nothing himself any more, except some little notions about the shop."   It was stated by several other witnesses that Robert had the principal management of the farm for a number of years before his father's death, and that his father recognised his acts; to say nothing of what Robert himself stated with regard to this matter upon a cross-examination, having been called by the exceptor himself. Robert, according to the testimony of the witnesses, managed the farm well, and his father recognised everything he did.   According- ing to the testimony of Mrs Strawbridge, (and there was no rea- son assigned why she should not be credited, for she swore directly in opposition to her interest), the old man expressly stated, that Robert should be paid in some way.   There was no evidence that he ever was " paid anything on account of his services."   Now the only question it seems to me is, when was this compensation to be made? and does the Statute of Limitations not interpose? It appears to me, that the only legitimate construction that can be put on this promise of the old man is, that the compensation was not to be made until after his death.   If this be the proper con- struction, then the statute would be out of the question.   The exception is therefore not sustained.

Exception was taken in court to this report, and upon argu- ment, the court below confirmed it.

*Miller,* for appellant, cited 3 *Rawle* 243; 7 *Watts* 46; 9 *Watts* 380; 10 *Watts* 172; 6 *Watts* 219, 352.

*Hepburn,* for appellee, cited 3 *Johns.* 301; 14 *Johns.* 379; 4 *Yeates* 358.

[Candor's Appeal.]

The opinion of the Court was delivered by

ROGERS, J.—Several exceptions have been filed to the decree of the Orphans' Court. But one, however, requires particular remark, namely, the credit of $1550, for work done on the farm in the lifetime of the intestate. In *Walker's Estate*, we took occasion to express the reluctance with which we listen to claims for wages by a son against the estate of a deceased parent, and subsequent experience has not changed or modified the opinion then entertained. It is pregnant with danger, as we verily believe, as well to the rights of creditors as to the other heirs, and cannot, of course, be entitled to countenance from the court, unless accompanied with clear proof of an agreement, not depending on idle and loose declarations, but on unequivocal acts of the intestate, as for example, a settlement of an account, or money paid by the father to the son as wages, distinctly thereby manifesting that the relation which subsisted was not the ordinary one of parent and child, but master and servant. No doubt should be suffered to remain, first, that the services were rendered, and next, that they were rendered in the expectation of wages, and not, as is generally the case, with a view to remuneration from the bounty of the parent either by will, or by gift in his lifetime. That Robert had the principal superintendence and management of the farm for several years before the death of the father, there is abundance of evidence. And on the supposition of the existence of a contract, that the charge for services is reasonable, I am not disposed to deny. But conceding this, does the evidence prove an agreement or understanding as to the compensation of the accountant, or the manner of remuneration for his labour, whether by will, gift, or in the shape of wages? This part of the case mainly, if not altogether, depends on the testimony of Charlotte C. Strawbridge, a sister of the accountant. Her father, she says, attended but little to business for several years before his death—they were paying money over to him at one time from John's estate, and he gave some, she thinks, to Thomas, and she observed, he was giving to the rest, and not to Robert; that she thought he deserved it most: the father replied, Robert was at home and did not need money, but if he were going off, he would give him some too. She observed, that he (Robert) was doing a great deal at home and managing for the family, and he then said " he shall be paid, or he may lay in for wages;" that he should be compensated, or words to that effect.

To authorize the credit, the evidence must be clear, distinct, and positive, and in every ingredient required, we think the proof is deficient. In admitting the literal truth of every word she says, (and considering the infirmity of human testimony, who can vouch for the verity of her statement?), can it be told with any certainty what the compensation was to be, when it was to be paid, or how it was to be made, whether by will, or by payment in the life-

time of the deceased, or after his death? Is it probable, that Robert was put on the footing of a hireling working for wages, or was he considered by the father in the light of a meritorious child, whose valuable services it was right and proper should be remunerated by will? It cannot escape observation, that the language, which it is said the intestate used, is that of a donor, and not of a debtor on whom a legal obligation was imposed. " Robert was at home and did not need the money, but if he was leaving his father's roof, he would *give him money*," as he had *given* it to Thomas, another son. The witness does not pretend to state the precise words, but their import, as she understood them; " Robert was to be paid, he might lay in for wages; he should be compensated, or words to that effect," is the language of the witness. He was to be paid, but when, and where, and in what manner, is left to conjecture. From the situation of the family, it is very improbable that any such arrangement as it is now convenient to set up, ever entered into the minds of the parties. But, be this as it may, no bargain or contract is proved, nor have such facts, in our judgment, been given in evidence, from which one can be fairly or clearly inferred. The father was old, and feeble, and helpless. Of course, the management of the business of the farm was thrown into the hands of the other members of the family, of whom Robert was the chief. It was managed by them as they thought proper, without molestation or remonstrance from their parent, who was content to receive what they chose to give him. This, it appears to us, is inconsistent with the idea of a contract. That it was the means used to support the family, each contributing his labour to that end, without any specific view to a fixed compensation, is the most natural view that can be taken of the circumstances in which the family was placed. But taking the words of the intestate to be accurately stated, what evidence is there, that they were ever communicated to Robert; that it received his assent, so as to form the basis of a contract? In this respect, the evidence is incurably deficient. Were this the case of creditors instead of heirs, (and yet the principle is the same), every one would be struck with the great hazard of allowing such a claim on such flimsy pretexts. The temptation to fraud, particularly where the family are in straits and difficulties, is too great. A court of justice does the most signal service to the community when they remove as far as human laws can, all temptation to fraud, and its kindred vice, perjury. We must carefully avoid throwing temptation in the path of integrity and truth.

As we are satisfied with the opinion of the court on the other exceptions, we affirm the same without particular remarks.

Decree reversed, as to the credit of $1550, and affirmed as to the residue.