SWARTZ, ADMINISTRATOR, v. HAZLETT et al.

Where a parent executes to his infant son a conveyance of property in consideration of services performed, it must be considered as a voluntary conveyance without legal consideration, as he is not legally bound to pay for his son's services. Such a deed is therefore void against the creditors of the parent, if made when his remaining property is insufficient to pay his debts.

Proof of fraudulent intent on the part of the donor is sufficient to avoid the deed, as against an innocent donee.

In determining the question of fraudulent intent of the donor, he must be considered as knowing the law and the state of his own affairs.

Where A, by a joint deed grants to his son and H certain premises, for which H pays a valuable consideration, and the son pays nothing, and the fact of this want of consideration on the part of the son, is known to H, the fraud in part of the conveyance makes it wholly void, as against the creditors of A at the date of the deed.

If the co-grantee, with the son, was ignorant of the partial want of consideration, whether the deed would be good as to him—quære.

The case of Taaffe v. Josephson affirmed.

APPEAL from the District Court of the Ninth Judicial District, County of Shasta.

The plaintiff, as the administrator of James Daigh, deceased, brought the suit for the purpose of his setting aside a certain conveyance made by his his intestate to the defendants on the twelfth of September, one thousand eight hundred and fifty-five, of certain premises, of the value of eight thousand dollars, and as grounds therefor, alleged that James Daigh was, at the time of said conveyance, and at the time of his death, indebted to various persons, in the sum of eighteen thousand one hundred dollars, and that said Daigh, at the time of said conveyance, and so at the time of his death, (without the property described in said conveyance,) was insolvent, and unable to pay his debts, and that, in due course of the administration, he had expended the remainder of his intestate's property, and that there was still due creditors the sum of nine thousand dollars. That at the time of said conveyance, the defendant, Daigh, was the minor son of his intestate, and subject to his guardianship and control, and that said conveyance as to both of the defendants, was made without consideration, and for the purpose of hindering, delaying, and defrauding the creditors of said intestate; that said defendants had enjoyed the use and occupation of the said premises from the date of the conveyance; and prayed that said deed should be declared void, and that he also recover damages for the detention of the property.

Both defendants answered separately—Daigh admitting his minority, but claiming that his father had permitted him to labor for himself, and that in the course thereof, his father had become indebted to him to the amount of two thousand three hundred

Swartz v. Hazlett.

dollars, and that, so far as he was concerned, that was the consideration for the conveyance.

Defendant Hazlett, set up that he paid James Daigh for an undivided one-half of the premises, the sum of two thousand one hundred and sixteen dollars; he also denied that the value of the lot exceeded the sum of four thousand dollars. Both defendants denied any fraud, either on the part of themselves or their common grantor. The Court below found that the consideration for the conveyance was actual indebtedness on the part of James Daigh, to both his son and Hazlett, and that it was a sufficient consideration to sustain the deed, although it was not commensurate with the value of the property; and dismissed the bill, from which decree the plaintiff appealed.

*E. D. Wheeler & E. Garter* for Appellant.

The insolvency of James Daigh having been shown; and the minority of his son John Daigh, the grantee and one of the defendants, having also been established; it follows that the conveyance made by James Daigh to his said son, was fraudulent and void against the then existing creditors. 3 John Ch., 500, (condensed edition, 206,) 504; 18 Wend., 391, 394, 399, 401; 2 Ves. Sen., 8 to 11.

It is not necessary that the grantees should have received the gift with a fraudulent intent.

The motives of the recipient of a gift, do not affect the validity of the same. 18 Wend., 388–9, 397; 1 Eden, 167; Ambler, 596, S. C.

The alleged contract by which deceased hired his infant son to come to California with him, is no contract, because it is not shown that the son accepted the terms offered, or came to this State pursuant to the same. Story on Cont., § 1.

It is *nudum pactum.* 5 Paige, 586.

It is void under the Statute of Frauds. Stat. Frauds, § 12; 5 Wend., 206; 11 East., 142.

Parents are entitled to the services of their children. 1 Black. Com., 453; 2 Kent, 193–4; 2 Mass., 113; Reeves' Dom. Rel., 290–1.

As long, then, as the child lives with the parent, every presumption is in favor of the existence of the ordinary relation of parent and child. Otherwise great frauds might easily be perpetrated.

The extent to which the authorities go on the emancipation of children, is, the child is permitted to collect its own wages, etc., earned in the employment of others. 7 Cow., 92; 2 Mass., 113; 2 Wend., 463; 20 John., 285, 456.

The emancipation of the son, as claimed in his answer, amounts to nothing for the following reasons :

First, There is no proof of acceptance on the part of the son.

Second, There is no consideration. 2 Wend., 463.

Third, It should have been in writing. Stat. Frauds, § 12; 11 East., 142; 10 East., 88.

The statements of deceased were inadmissible. Sup. Ct. Cal., January Term, 1857, p. 208.

*Robinson, Beatty & Botts*, for Respondents.

The first question raised by the elaborate brief of the appellant is this: What is the legal relation of parent and child, and what is the basis of the doctrine, that the father is entitled, by law, to the services of his infant child? Much of the error into which, as we conceive, the appellant has fallen, arises from confounding the relation of parent and child with that of master and servant. Now, we apprehend, they stand upon a footing altogether different. The right of the father can hardly be called the right of property. It is not assignable—it is inseparably connected with the correlative obligation to cherish and maintain—it grows out of the duty to obey, and is, upon the part of the child at least, only a moral, and not a legal, obligation. It is true, that against others, who have had the services of an infant child, the father can recover the value of those services; but even this is, as it were, because of the natural guardianship of the father, and is for the purpose of enabling him to maintain the child. As between parent and child, there is no legal title on the part of the parent to the services of the child. The parent may indent his child as an apprentice; that is, as a means of education and maintenance, he may contract with another to stand, *in loco parentis;* but the contract must be for the benefit of the child, not of the father. He cannot compel the child to live with another as a mere servant; he can neither hire nor sell him. A creditor certainly could not attach the father's interest in his child's services, and yet to this, almost, would the appellant's argument go.

We arrive, then, at this conclusion, that although the parent may claim the fruits of his infant's labor, it is for the benefit of the child, and not for others; that is, it is by way of remuneration for what he has done, and as a means of performing what he has yet to do for the child himself; that these rights and obligations lie wholly within the circle of the affections, into which no stranger can be allowed to intrude. It is true, that in the ordinary course of things, the infant, living with the father, and working with him, the labor of the child is so mixed with that of the parent, that it all accrues to the parent, and may go to his creditor. But if this confusion, by an arrangement between the father and child, is avoided—if the fruits of the child's labor, by the consent of the father, be set apart for the separate benefit of the child, the creditors of the father can never reach it. To this effect is the leading case of Jenney v. Alden, 12 Mass. In this

Swartz *v.* Hazlett.

case, the father being solvent at the time, promised the son wages; the father afterwards purchased land, paid for it with his own money, and had the deed made to his own son. Here, there was no stipulated amount of wages; but it was found, that the value of the land was commensurate with the services of the son. The father died insolvent, and the creditors attached the land as the property of the father. The Court held, that the services of the son under the circumstances constituted a good and valuable consideration for the conveyance of the land to him; that the father became indebted to the son, and legitimately paid the debt by procuring this conveyance to him. So much do the Courts favor this emancipation of the child, as it is called, that it will be inferred from the slightest evidence. Thus, in Burlingame *v.* Burlingame, 7 Cowen, 93, the Court say, that the expression, " the employer would do well by the son," who worked for him, seems to indicate, that no claims of the father were in contemplation. This emancipation may be inferred from circumstances. Conover *v.* Cooper, 3 Barb., 115.

In the case of Steel *v.* Steel, 2 Jones, Pa., 64, the son sued the father's executor for services rendered the father in his lifetime, and during the infancy of the son. The Court say, that the facts of the case furnish abundant proof that the peculiar relation of father and child for that purpose had ceased, and that the parties contracted together on the basis of master and servant.

If we are correct in our first position, that the right of the father to the fruits of the labor of his child, is one that he may surrender to the child himself, and that his assent to this emancipation may be made without writing, then do the words and statements of the father become a part of the *res gestæ*, and are provable as such.

We were seeking to establish the fact, that the father had, in the language of the Court, in Steel *v.* Steel, substituted the relationship of master and servant for that of father and child. It is true, that other circumstances may be adduced, to establish the existence of this relation; but what so conclusive as the statement of the father himself? In the northern States, where this custom of filial emancipation prevails, it is frequently done, by a publication signed by the father, notifying the public that he has released his son from any further obligation to work for him. Could it be pretended that such a fact was not admissible, either against the father or those claiming under him? And what is such a publication, but a statement of the father concerning the new relation that has been established between himself and his son? Accordingly, we find in the cases heretofore cited, frequent reference to the proofs in relation to what the father said and did touching the emancipation of his son. But even as admissions of the father, we apprehend they are admissible against his creditors, who are claiming under him. Again, even if this

evidence were not otherwise admissible, they opened the way for it by proving, by their own witness, that old Daigh talked frequently about a settlement with his son John.

The Court finds, as matter of fact, that Daigh, the father, had manumitted the son, and employed him and his cousin, the other defendant, to work for him, before he was in failing circumstances, and that the property conveyed was no more than a fair and adequate consideration for the services rendered; also, that neither of the defendants were apprised of the insolvency of the deceased at the time of the conveyance.

As to the defendant, Hazlett, there can be no pretence to divest him of his interest in this property. He was the nephew of the deceased, he worked for him, and paid debts of the old man's, amounting to $3,665, out of the funds of himself and cousin; the other defendant; and some of these were debts upon which these poor boys were security for the old man. The creditors of James Daigh find John old enough to become his father's surety; and it is not the honest boy who pleads the privileges of his infancy, but the greedy creditor, who seeks to avail himself of the obligation arising from his minority. The record does not disclose the fact, but it is very possible, that some of the creditors who are seeking to set aside this conveyance to young Daigh and Hazlett, are some of those to whom these very boys have paid, out of their earnings, since the old man's death, money, as his sureties. If they deny him the rights of a man, they should, at least, have accorded to him the protection and privileges due to a child.

BURNETT, J., delivered the opinion of the Court—MURRAY, C. J., concurring.

This action was brought by the plaintiff, as administrator of James Daigh, deceased, to set aside a deed executed by the deceased in his lifetime, conveying to his nephew, Charles F. Hazlett, and his son, John Daigh, jointly, certain real estate therein described. The complaint charges that the deed was fraudulent and void as against creditors, and alleges the insufficiency of the assets to pay the debts of the deceased, without this property.

The defendants answer separately, each insisting that the deed was fair and honest, and each setting forth the consideration paid by him as his portion of the price of the land.

The defences set up by the defendants make it necessary to examine them separately, as they do not rest upon the same grounds.

On the part of John Daigh, it is insisted that while he was an infant, living with his father, the deceased voluntarily emancipated him, and then promised to pay him for his labor; that defendant lived with and labored for his father, for some two years and a half, and that for this labor the father was indebted

to the son to the amount of two thousand three hundred dollars, in consideration of which he made the deed to him of an undivided half of the land.    To sustain these alleged facts, the defendant proved the verbal declarations of his father, made at different times *before* as well as after the execution of the deed, the most material of which is thus stated by one of the witnesses:

"Deceased said that, previous to his coming to California, he promised to give John Daigh two thousand five hundred dollars if he would come to California with him and stay two years."

There was no proof of any consent on the part of the son, of any accounts having been kept, or that John Daigh was ever present when these declarations were made.

In the case of Murdock *v.* Murdock, decided at the April term, we held that when "a party sustains to another a certain relation, and assumes a certain position inconsistent with the claim set up, the proof should either show an express contract, or conclusive circumstances from which a contract might be justly implied."

The right of a parent to the services of his child is not disputed; and the resulting right to change the residence of the child is equally clear.    5 Paige, 596.    And it is equally well settled that a parent may, for some purposes and under some circumstances, emancipate his child.    In the case of Conover *v.* Cooper, 3 Barbour S. C. R., 115, it was held that the intention of the father to emancipate his minor child was a question of fact, and in the absence of direct proof, may be inferred from circumstances.    In that case, the father was absent for several years, leaving his infant son to manage for himself, and contributing nothing to his support, and not interfering in any way with his son's engagements; it was, therefore, held that the son could sue and recover, in his own name, for work and labor done while a minor.

The same doctrine is laid down in the case of Burlingame *v.* Burlingame, 8 Cowen, 92.    In the latter case, the infant performed the labor with the consent of his father, and for another person; and upon a promise to pay the infant, it was held that the latter could maintain an action in his own name.    So in the case of Benson *v.* Remington, 2 Mass. R., 113, Parsons, C. J., says: "The law is very well settled, that parents are under obligations to support their children, and that they are entitled to their earnings.    It is true, parents may transfer this right, or authorize those who employ their children to pay them their own earnings, and the payment will be a discharge against the parents."

We have been referred by the counsel of the defendants to the cases of Jenney *v.* Alden, 12 Mass. R., 375, and Steel *v.* Steel, 2 Jarvis Penn. R., 64.

In the first case, the father had given his son his liberty at the

age of fourteen. The son went to sea and earned wages, which were received by his father at different times. The father purchased a tract of land, and took the deed in the name of his son. At the time the deed was made, the father was in good credit, and not involved; and it was shown that the amount of wages received by him was about equal to the sum he paid for the land. Under these circumstances, the Court held the deed good. In the second case, the suit was by the son of the deceased against the executor, to recover for services rendered, goods sold, and money paid, for the use of the deceased, *after* the plaintiff became of age. The plaintiff was a married man, of full age, living separate and apart from his father, upon a farm of his own, and the labor was performed by himself and children upon his father's farm. The proof of the services was clear, and the Court held he was entitled to recover.

It will be perceived that, in most of these cases, the infant was allowed to work for others, and manage for himself. In such cases a payment to the infant was a payment to the father; and if no payment was made, the infant could sue in his own name. The doctrine in reference to this class of cases is well stated by Savage, C. J., in Clark *v.* Fitch, 2 Wend., 463 :

" When the daughter left her father's house, he gave her her time, that is, he allowed her to receive her own earnings, and told her she must provide for herself. The effect of this would be, that if her employer paid her wages during her minority, the father could not compel payment again to him. But suppose the daughter had become sick and infirm, would not the father have been liable for her support ? And in that event, surely she would be returned to her former situation of servant to her father; and even without any such necessity, I apprehend the paternal rights of the father over the child were not relinquished by what passed between them. There was no consideration for the relinquishment of his daughter's services, and, in my opinion, he might at pleasure revoke the license he had given his daughter, and call her home, and employ her in his service till she should arrive at maturity."

The principle upon which the infant is allowed to collect his wages, is that of *agency.* The infant can be his father's agent, and whether he is so or not is a question of fact, like any other question of agency, which may be proven by either direct or circumstantial testimony. And as the infant has the right to collect the wages earned by him, he is allowed to sue in his own name. The mere form of bringing the suit is not material, and does not go to the substantial merits of the matter. In many, if not in most cases, the parent might sue. As either party may sue, the first suit brought would exclude the other. ⸙ But when the question comes up between the parent and the infant, it presents a very different aspect. It is the duty of the parent to

supply his child with necessaries; and he is liable to others who furnish them, under certain circumstances. Can the parent then divest himself of this duty by giving the child his own time? Suppose the child is taken sick, and the parent has means, is he not bound to take care of him, even after he has given him his time? How, and in what way, and under what system of morals, can a parent absolve himself from that responsibility? And if that responsibility continues, the power over the child must also continue. The responsibility and the power must stand or fall together. The duty of the parent to feed, clothe, and educate the child, must be commensurate with the power to control and govern.

It is difficult to see how such a responsible and delicate relation can be destroyed by the voluntary act of the father without consideration. It is difficult to understand how a parent can cease to be the natural guardian of his infant child under such circumstances. And being the guardian of his child, it is difficult to see how any contract, as between them, could be enforced. It is the duty of the parent to support the child; and for doing this, it is very doubtful whether he could maintain a suit against the child, even upon an express promise, made after becoming of age. And when the father promises his infant child a certain reward for doing that which he was already bound to perform, the agreement has no consideration whereon to rest. It is one of those understandings that must be left to the parties to settle themselves. It is of too doubtful and delicate a character to be the subject of investigation in a Court of Justice. And while I will not undertake to say that no such a case was ever sustained in a Court of Justice, I have not been able to find one; and the learned counsel for the defendants have not referred to any such.

If such agreements between a parent and his infant child could be enforced in a Court of Justice as a good and valid contract, it would certainly place the father and child in a very awkward position with respect to each other. Even in cases where the child is of age, and remains in the service of the parent as one of the family, Courts have manifested great jealousy of claims for compensation. The case of Candor's Appeal, 5 Watts & Serg., 515, is a very strong one. In that case, the alleged services were all performed after the son was of full age, and yet the Court held he was not entitled to recover, upon the ground that no mutual contract was proven. The remarks of Rogers, J., in delivering the opinion of the Court, are very clear and forcible.

"In Walker's estate we took occasion to express the reluctance with which we listen to claims for wages by a son, against the estate of a deceased parent; and subsequent experience has not changed or modified the opinion then entertained. It is

pregnant with danger, as we verily believe, as well to the rights of creditors, as to the other heirs, and cannot, of course, be entitled to countenance from the Court, unless accompanied with clear proof of an agreement, not defending on idle and loose declarations, but on unequivocal acts of the intestate; as, for example, a settlement of an account, or money paid by the father to the son as wages, distinctly thereby manifesting, that the relation which subsisted, was not the ordinary one of parent and child, but master and servant." "Were this the case of creditors, instead of heirs, (and yet the principle is the same,) every one would be struck with the great hazard of allowing such a claim on such flimsy pretexts. The temptation of fraud, particularly where the family are in straits and difficulties, is too great. A Court of Justice does the most signal service to the community, when they remove, as far as human laws can, all temptation to fraud, and its kindred vice, perjury. We must carefully avoid throwing temptation in the path of integrity and truth."

If these views be correct, the alleged agreement between the deceased and his son, was invalid; and the deceased was not indebted to the defendant, John Daigh, when the deed was executed. Even if the defendant had been of age, the proof of the contract would have been at least very dubious.

The deed then stands as a voluntary deed, executed while the deceased was in insolvent circumstances. It is true that the Court below considered that the answers denied every material allegation of the complaint, except the minority of John Daigh, which was admitted. But this would seem to be incorrect. The complaint asserts the fact that, the estate was still indebted to the persons mentioned, and others, in about the sum of nine thousand dollars. This is not denied. The complaint also alleges, that the deceased, at the time the deed was made, was, *without* the property described in the conveyance, insolvent. To this allegation defendants answer, that if the deceased was insolvent at the date of the deed, they did not then, nor do they now, know the fact. This answer is not sufficient under the forty-sixth section of the Practice Act. As the complaint was verified, there should have been a specific denial to each allegation controverted by the defendants, or a denial thereof according to their information and belief.

The deed then being voluntary so far as John Daigh is concerned, can it stand against creditors?

The question, whether a voluntary settlement is void under all circumstances, as against antecedent creditors, has been much discussed by different Judges, and different conclusions arrived at. In Livingston *v.* Livingstone, 3 John. C. R., 481, Chancellor Kent held, that such a settlement was void under all possible circumstances, as against antecedent creditors. The same view

is taken by Justice Bronson, in the great case of Van Wyck v. Seward, 18 Wend., 398. The Supreme Court of South Carolina have substantially held the same doctrine. The remarks of Mr. Justice Bronson are very just and forcible.

"As against the donee, this question never arises until the creditor has lost all other means of obtaining his demand. And why should he lose his debt when the property, on the credit of which it was contracted, has neither been sold, lost, nor expended by the debtor in the course of his business, but has been given away to his family? Why should the right of the creditor to reach the property in the hands of the donee, depend on the inquiry, whether the debtor parted with too much, or too little of his property? Can there be such a thing as a *reasonable* family settlement, when it ultimately works injustice to the existing creditors of the grantor? I have never been able to discover the principle upon which a title acquired by mere gift, should, under any circumstances whatever, be deemed superior to the claim of the creditor to be paid his debt."

The rule laid down by Chancellor Kent, and sustained by Justice Bronson, and so many others of our wisest and best jurists, is, in my conception, the plain, the honest, the efficient, and the humane rule, and the one that, in its practical results, would ultimately produce the greatest amount of good. Whenever laws are so framed as to afford opportunities, and offer inducements, for the commission of fraud, the standard of private and public morality is injured, for which no pecuniary consideration can ever constitute any adequate justification. But I agree with the remark of Chancellor Kent, 2 Com., 442, note " a," " that the doctrine in Read v. Livingstone, and of the English Chancellors, on whom it rested, is, I greatly fear, too stern for present times."

.But our statute concerning fraudulent conveyances and contracts, has settled the rule upon this subject. By the provisions of the twenty-third section, the question of fraudulent intent in all cases arising under the act, shall be deemed a question of fact, and not of law, and the want of a valuable consideration shall not constitute conclusive evidence of fraud. The statute contains two provisions. The fifteenth section makes possession by the vendor, after a sale of personal property, conclusive evidence of fraud as against creditors and subsequent purchasers in good faith. This provision of the statute is only affirmative, that a particular fact shall be conclusive evidence of fraud; but it is not *exclusive*, and does not say, that no other fact shall be so considered by the Courts. But in reference to one class of cases, there is a restrictive provision that "no conveyance shall be adjudged fraudulent as against creditors or purchasers, solely on the ground that it was not founded on a valuable consideration." Com. L., 202.

Under these provisions, the mere fact that the deed to John Daigh was voluntary, would not, of itself, constitute the conveyance fraudulent as to him. It will be necessary, then, to look to other facts in order to determine this question. And as to the alleged fraudulent intent, it is only necessary to inquire into that of the *donor,* and not into that of the *donee.* 18 Wend., 397. See also the twenty-fourth section of our Statute of Frauds, which protects only the innocent *purchaser,* and not the innocent *donee.*

In determining the intention of the deceased, existing at the time he made the conveyance, it must be assumed that he knew the law, and the fact that he was indebted to others. Taaffe, McCahill & Co. *v* Josephson, decided at the present term. As it must be assumed that the grantor knew both the law and the facts, the proof of a fraudulent intention is conclusive from the testimony. He knew he owed his son nothing for his labor, and the amount of property conveyed by the grantor, and the amount of debts he at that time owed, showed clearly, that he knew his creditors must be injured, if the conveyance should be held valid. And it may be safely assumed, that when a person makes a gift of such a proportion of his property, as, considering the amount of his existing debts, a prudent and just man would not make, this circumstance is conclusive evidence of fraud. If, at the time the gift is made, there is a reasonable ground for the fear that existing creditors will not be paid, and it should afterwards turn out that the other property of the doner if insufficient, the gift should be set aside.

We can only judge of intention from facts and circumstances; and as every man must be held to know the law and the facts regarding his own business, he must be held to a reasonable use of this knowledge. If, therefore, he does that which a prudent and just man would not do under the existing circumstances, his act should be disregarded. It cannot be supposed that our statute intended to protect the donee against anything, except those unexpected events that prudence and integrity could not foresee.

If these views be correct, they dispose of the case, so far as the defendant John Daigh is concerned. In reference to the case of defendant Hazlett, the proof shows that he was of age, and that he did perform about one year's labor for the deceased. It is, however, shown, that a considerable amount of personal property also went into the hands of the defendants, estimated at about four thousand dollars in round numbers. But, at the same time, it is shown that defendants paid debts of deceased to an equal amount, and this, in pursuance of an understanding with deceased that these creditors should be paid. Most of these payments were made before, but some of them after, the death of James Daigh. The conclusion of the District Judge that de-

ceased was indebted to defendant Hazlett at the time the deed was executed, seems to be supported by the testimony.

In the case of Taaffe, McCahill & Co. v. Josephson, we held that when a part of the consideration of a contract is illegal, or when an entire judgment is composed of several elements, one of which is fraudulent, the whole is void. This is undoubtedly the just rule, as between single parties, or when all the purchasers have participated in the illegal consideration. (See 7 Paige, 277; 4 Kent, 281, note "a;" 16 Wend., 183.) But in a case where the deed is made to two or more purchasers, and the consideration passing from some of them, is illegal, but the consideration paid by the others is good, and there is no knowledge on the part of the innocent co-purchasers of the illegal consideration, it may admit of a very strong doubt whether the instrument would be void in toto.

In this case, however, it is not necessary to determine that point. The defendant Hazlet must be held to have known the law; and from the testimony, it is clear that he did know what was the alleged consideration paid by John Daigh to the deceased. In other words, he must have known that John was an infant; that the father owed him nothing in law for his labor, and that, therefore, the deed was made by the father without consideration, with intent to injure the creditors. The facts proved show that Hazlett was a member of the family of the deceased; was familiar with his business, and must have known that he was largely in debt, if not insolvent. Under these circumstances he participated in the conveyance, and whether he actually intended to do that which he thought wrong or not, he is equally as responsible as if he did, for the law cannot but consider an act done with such knowledge both of the law and of the facts, as done with the intent to hinder and delay creditors. For these reasons, I think the judgment of the Court below should be reversed, and that Court directed to enter a decree for the plaintiff.