RUSSELL, administrator, *et al. vs.* SWITZER.

[This case was argued at the last term, and the decision reserved.]

A step-son who after the death of his step-father seeks to recover in equity the whole of his step-father's estate by reason of an alleged trust created by the latter in favor of the former, must prove the trust fully and with due certainty. Letters and parol declarations evincing a settled intention that the step-son shall succeed to the estate, are not sufficient, if they look to succession through a supposed rule of inheritance, rather than through some present or past limitation upon the absolute and independent ownership of the step-father in his life-time. Mere letters and declarations are no substitute for a last will and testament.

Equity. Trusts. Specific performance. Contracts. Consideration. Before Judge TOMPKINS. Chatham Superior Court. October Term, 1878.

This case is fully reported in the opinion.

W. GRAYSON MANN, for plaintiffs in error.

A. P. & S. B. ADAMS, for defendant.

BLECKLEY, Justice.

Leonard Finsterer and Madeline, his wife, died in Savannah, of yellow fever, on the 25th day of September, 1876, he surviving her a few hours. He left no children; she left one son by a former husband. Finsterer and wife were both natives of Germany, he of the kingdom of Bavaria, and she of the kingdom of Wurtemburg. They were married in the city of Baltimore in the year 1842 or 1844, at which time her son was from nine to eleven years of age. Finsterer brought into the coverture two horses and two carts, and his wife brought in some small property, but of what it consisted does not appear. After their marriage, they seem to have resided at Baltimore, Md., Charleston,

S. C., Augusta, Ga., and in Chatham county, near Savannah, and in Savannah. Her son, whose name was John G. Switzer, resided with them until the commencement of the late war (1861), when he entered the Confederate army. He was captured by the Federal forces, and became a resident of the state of Illinois, where he married in 1865, and where he has ever since resided. Until he left Georgia in 1861, he labored for and with Finsterer, his step-father, receiving only maintenance, his surplus earnings being taken by Finsterer, or going into the common stock. How much the family had accumulated when Switzer ceased to be a member of it does not appear; nor does it appear what his labor or his earnings were worth. The realty left by Finsterer at his death was appraised by the official appraisers of his estate at $4,750, and the personalty, including $910.95 in cash, was appraised at $2,552.70. Total appraisement, $7,302.70. One parcel of the realty, appraised at $250.00, was held by deed, dated in 1859, reciting as the consideration paid $450.00; another parcel, appraised at $2,400.00, was held by deed, dated in November, 1863, reciting as the consideration paid $7,100.00; and the third parcel, appraised at $2,100.00, was held by deed, dated in December, 1865, reciting as the consideration paid $2,500.00. These several deeds conveyed the premises described therein (all situated in Chatham county) to Leonard Finsterer, his heirs, etc., no mention being made of any trust or remainder in favor of Switzer or any other person.

Administration upon the estate of Leonard Finsterer was granted by the ordinary of Chatham county to Philip M. Russell, after which, to-wit: on the 29th of December, 1877, John G. Switzer filed his bill on the equity side of Chatham superior court, against said administrator and certain persons, residents of Bavaria, Germany, claiming to be the next of kin and heirs at law of the intestate. The bill alleges that the intestate left no blood relations, and that these German claimants are in no wise of kin to him; that

by an act of the legislature of Georgia, approved Febru-
ary 24, 1877, the complainant was empowered to receive, sue
for, and collect all the property which was called the prop-
erty of the intestate, and in the hands of his administrator ;
that the complainant alone is entitled to receive said
property that he is the only son and heir at law of Madeline
Finsterer, and that as such he is entitled to all the property
of which she died seized, or to which she was entitled. It
further alleges that apart from the said act of the legisla-
ture, and independently of any right of the complainant
to inherit, he is entitled to the whole of the property in
the hands of the administrator, "for the reason that all the
property held by complainant's step-father at the time of
his death was trust property, held by him in trust for the
sole benefit of the complainant after the death of the said
Leonard and his wife, Madeline; that although the legal
title to the real estate may have been taken in the name of
his step-father alone, and his said step-father may have had
control of the personal property and effects, yet the said
Leonard did not accumulate one-half the real estate or per-
sonal property, but that the greater portion was accumu-
lated by the complainant and his mother; that from the
time complainant was a young boy until he reached the age
of thirty years he remained with his step-father, worked
with him, was apprenticed out by him, and gave all his
earnings to his step-father, with the distinct understanding
that all the property accumulated should be held by the
said step-father in trust for the benefit of himself, com-
plainant's mother and complainant, and that after the death
of said Leonard and wife, all the property so accumulated,
and all the property which they, the said Leonard and Mad-
eline, or either of them might have, or be entitled to, should
belong to and become the property of complainant ; that
the said Madeline, by gardening, running a store, and sell-
ing in the market accumulated more of the said property
than did her husband ; that she allowed her husband to take
her earnings and invest them in the said property, for the

same reason which influenced complainant; that a considerable portion of her earnings was made and invested with the understanding and agreement aforesaid subsequent to the year 1866; that the said Leonard frequently, and at all times, during his life-time, admitted that the said property was purchased with money belonging to complainant and his mother, with the distinct agreement that it should be owned and used as the property equally of said Leonard, complainant and his mother during their lives, and that upon the death of said Leonard and the mother of complainant, it should vest absolutely in complainant, and that he, the said Leonard, held said property upon said trust and use, and no other; that said Leonard always observed and respected the trust while in life, and it was his desire, intention and belief that it would be fully carried out after his death, and that complainant would obtain, in his own right, the entire property; and that said Leonard was a very ignorant man, and his failure to express this trust in the deeds taken by him for said property, or by other written documents to fully protect the rights of complainant in said property, was due to the ignorance and mistake of the said Leonard, and to his perfect assurance and belief that it was unnecessary."

The bill waived discovery, and prayed for a decree declaring the complainant entitled to the property, for a full accounting and settlement by the administrator, and for general relief.

The defendants all answered. The German claimants, setting up their rights as next of kin and heirs at law, turned their answer into a cross-bill, and prayed that the property be decreed to belong to them as heirs, that the administrator be required to turn it over to them, and make a full and final settlement, and for general relief. None of the answers admitted any contract or agreement.

At the trial, the evidence submitted by the complainant tending to prove an agreement or understanding, consisted of certain letters and certain parol testimony, the material

parts of which will now be quoted from the record. A letter from Finsterer and wife to the complainant, dated August 8th, 1875, says: "Now we could hardly get half what the property is worth, as we cannot afford to lose so much because we had to work too hard, myself, your mother, and you too, my son; you know how hard it came. . . . You wrote to me to help you with a few hundred dollars, but I am very sorry I cannot help you at present. You see that I would have to sell the property for the purpose of getting the money, which I would not like to do. Let it remain together, for I cannot live much longer, and it will then make a fine property for you, my son, consequently you must not think hard of me." A letter from Finsterer alone to the complainant, dated November 23d, 1875, says: Dear son, in your letter you will find four post-office orders, each for $50.00. Write immediately on receipt of them, as they are only good for thirty days. My son, take good care of that money, as it is the last you will get from me during my life. After my death you will get all. We are old. You have promised us you will take that one to you which is left." A letter from the same to the same, dated September 16th, 1876, says: "My dear son, perhaps this is the last letter you will receive from me; if so, some one else will write to you and give you information. Should it happen that I should die, you must come, so that the property and things as I have told you that after my death all shall be yours, that I have only saved it for you." A letter from Finsterer and wife to the complainant, dated September 19th, 1876, says: "The yellow fever is here, and several of our acquaintances have died with it, and we are not feeling well ourselves. Your mother has been feeling very bad for some days, and I feel very lonely now myself, and we cannot tell which one of us the Lord may call home first. And, my dear child, if any one of us should be called off by the fever, don't forget the promise that you have made to us that you would come and take care of the one left, and take charge of the

property. You know we have no heir but you, and no one can be nearer to me than you. We will be very lonely if sick and you so far away. This may be the last letter we will ever write to you, but if I am called off, do come to your mother and take good care of her, for all I possess is hers and yours." These four letters were all written at Savannah. A witness, *Mayer*, testified : " Finsterer has frequently told me that after his death and his wife's,all the property would belong to John,referring to Switzer. . . . He has told me at least fifty times that after the death of himself and wife, the property would be inherited by his son John. He gave as a reason for John's getting the property that he had worked faithfully with him and had helped to accumulate it." Another witness, *Von Glahn*, testified : " Have heard Finsterer say that John G. Switzer would inherit his property at his death. . . . Have heard him say that Switzer must not write for any more money, that he and his wife were getting old and could not send John any more money, as times were so hard." Another witness, *Mrs. Hicks*, testified : " I attended Finsterer in his last illness. He told me that after his death all the property would belong to John. He told me to write to him. I have heard him say that John's earnings went into the property—that he would allow him only a small amount for tobacco ; that when he, Switzer, was at the butcher's trade, he, Finsterer, collected his moneys. . . . Have heard him say that John would be his only heir after his death." Another witness *Kailbach*, testified : " Have heard Finsterer say that complainant would get all the property after his death and his wife's. I sent a letter from Finsterer to complainant in 1875, containing a remittance of $150.00. Finsterer told me at the time he could not send him any more money then, the times were so hard." Another witness, *Ruckert*, testified : " Finsterer has told me that complainant would get all the property after the death of himself and wife, that ' we have all worked together and saved it together, and when I die, it will all go

to John.' This was during the epidemic of 1876, just before he died—within a week. . . . He has told me that they all three worked together." *Dr. Fish*, the physician who attended Finsterer in his last illness, testified : "Shortly before his death, when his wife and himself were both down with the yellow fever, I asked him what disposition of his property he had made. He replied emphatically, that no will was necessary, because John G. Switzer would inherit all his property after the death of himself and wife ; that the whole matter had been fully settled." Another witness, *Mrs. Hermis*, testified : " I heard Mr. Finsterer say that, ' John Switzer, my son, worked with me faithfully, and he shall be the only heir after me and my wife, Madeline; what John earned went into my pocket,' as John should inherit all he's got. I heard him say John was allowed when he worked with him the food he ate, his clothes and tobacco, and that was all. The reason that he gave why John should get the property was, because John worked so faithfully with him, and he thought it no more than right that John should get the property, so long as he worked for it. He said that, ' if I should take sick that I will make a will in favor of my son John, that he shall be the heir.' He said that he would make a will so that nobody could get anything until after his wife, Madeline, died, and then his son John would get it. A short time before the yellow fever broke out he was talking about a will. He always seemed to think that he would die first. For that reason he wanted to make a will so that nobody would get anything until after his wife died. If he thought that he would have outlived his wife, it would not have been necessary to have made a will, but he always expected to die first. I heard him say, ' After I am dead my wife, Madeline, will inherit all my property;' the exact words that he used were, ' After my death my wife is my only heir.' ' If I thought I would die first, I would make a will for my wife to protect her so that nobody could get anything until my wife was dead; then my son John should

have it.'" Another witness, *Mrs. Gammert*, testified: "I have often heard him say nobody would get any of the property except 'my son John.' . . . A week before he died he was in my house, and I asked him if he had made his last will. The yellow fever was then here. He said, 'No, I think there is no use to make a will; when I and my wife die, my son will get everything.' He meant by 'my son,' John Switzer." Other testimony in behalf of complainant (most of it from the same witnesses) was to the following effect: *Mayer*—Knew Finsterer for about twenty years, and complainant since he was a child about twelve years old. Finsterer brought complainant from Baltimore. They first settled in Augusta, then came to Savannah. Finsterer subsequently bought a farm at White Bluff, near Savannah, where they lived together. Finsterer was a hard-working and economical man. He had no property when he married; his wife had some. Complainant used to go out fishing at White Bluff, and worked on the farm with his mother and step-father. He would bring the fish to market and sell them for Finsterer. Subsequently they settled in Savannah, where complainant and his mother helped Finsterer in keeping a store. When complainant was quite young, Finsterer apprenticed him out to the butcher's trade. He worked for Finsterer up to the war in 1861—about the fall of Fort Pulaski; he had no separate property of his own; Finsterer supported him; after the war Finsterer sent him money several times. Witness has heard Finsterer say he had no blood kin, neither brother nor sister. At his death he was about sixty-five years of age. *Von Glahn*—Knew Finsterer many years; he talked very little about his affairs; was a hard-working man. Complainant worked with him in Augusta and at White Bluff; when they lived at the latter place complainant was grown, and he lived and worked with Finsterer until the beginning of the war. *Mrs. Hicks*—Knew Finsterer and wife seven years. Wrote the letter of September 19th, 1876, in their presence—read it over to

them and they approved it. It was posted by him. He spoke English very imperfectly. He sent money to complainant at different times, some in 1875. *Ruckert*—Knew Finsterer from 1852. Has heard him say he had nobody in the old country any more. Knew of complainant working with him before the war at fishing and farming. Finsterer supported him ; complainant had no property of his own. Finsterer at his death was about sixty-five. *Dr. Fish*—First met Finsterer in 1850 or 1851, when he came from Augusta; he had with him the complainant, who was twelve or fourteen years of age. They went back to Augusta, then returned to Savannah, and settled on a farm at White Bluff, near the city, where they (Finsterer and wife and complainant) lived and worked together. Finsterer was very peculiar. He was very penurious, and not likely to pay money for legal advice. He became at last much emaciated because too stingy to buy necessary food. His knowledge of English was very imperfect; he had but one idea, to make money; was just but close; in mind, rather below the ordinary; was not likely to be posted about the laws. Witness heard him say he had no blood kin, and that he had never written to the old country ; was about sixty-five; said he had sent money to complainant. *Mrs. Hermis*—Knew Finsterer and wife from April or May, 1865. He was very intelligent, but very close; was a hard-working man ; spoke very poor English. *Mrs. Gammert*— First knew Finsterer when he lived at White Bluff; saw him seldom until he removed to town : was intimate with him for the last seven years of his life ; often heard him say he had no relatives or kin in the old country—the last time about a week before his death ; he said he was a young man when he came to Baltimore.

On the part of the German claimants, there was testimony strongly tending to show that they were related by blood to this identical Leonard Finsterer, and that they were his next of kin and heirs at law under the statute of distributions of this state.

Among other questions in writing put by the court to the jury, and which they answered in their verdict, were the following: "Are the defendants (other than the administrator) the next of kin and heirs at law of the deceased Leonard Finsterer?" Answer, "Doubtful." "Was the property set forth trust property, owned and held by Leonard and Madeline Finsterer, with the wish, intention and desire that it should vest in and belong absolutely to the complainant at their deaths?" Answer, "Yes." "Did the said Leonard Finsterer and his wife honestly and firmly intend and believe that the complainant would get all the said property owned by them, or either of them, at their deaths, and this without a deed or will or any other paper or writings than were made, and did they die in this belief?" Answer, "Yes." "Was it not from accident and mistake that Leonard Finsterer and his wife, or either of them, failed to make out the proper papers to fix the right and title to said property in the complainant fully and absolutely?" Answer, "Yes." "If it was through such accident and mistake, has the fact been shown to you by the evidence, clearly, unequivocally and decisively?" Answer, "Yes." "Under the evidence and the law should the property in dispute, and now in the hands of the administrator, be paid over to the complainant, or to the defendants claiming it?" Answer, "To the complainant."

The court thereupon decreed that all the property, with the rents and profits thereof, is vested in the complainant as absolute, sole and exclusive owner of the same, and that the whole be turned over to him by the administrator, and that the administrator make with him a final settlement.

The defendants moved to set aside the decree because of uncertainty and incompleteness in the verdict, and for other imperfections in the same. They also moved for a new trial on many grounds; among them that the verdict was not sufficiently full, did not find all the issues, and was not supported by the evidence, but was contrary thereto, and

to the law.  Both these motions being overruled, the defendants excepted.

The act of February 24, 1877, has no efficacy except as a relinquishment by the state of any right which the state could assert, by escheat or otherwise, to the property in controversy.  It does not undertake to divest the rights of any person or persons who may be entitled to claim under the general law of descent or inheritance.  Inasmuch as the verdict does not settle whether the Bavarian claimants are the heirs at law or not, there must be a new trial unless the evidence supports the finding of the jury upon that part of the bill which asserts ownership in the complainant irrespective of the act of February 24th, 1877.  This assertion of ownership is put by the bill on the theory of a trust. Grant that a trust resulted on account of the investment of complainant's earnings, that trust would not extend to anything which he did not help to earn, or in which no part of his earnings were invested.  The acquisitions of Finsterer and wife during the fifteen years which elapsed after the complainant ceased to labor for or with them, would surely be free from any resulting trust in his favor.  It is manifest that the finding of the jury as to the entire property cannot be upheld without passing beyond a resulting trust. Was there any creation or declaration of an express trust? Obviously there was not.  Nothing is more certain than that Finsterer intended that the complainant should have all his property after his own death and the death of his wife, but there is no trace of any express contract to that effect.  Such a disposition was dictated by love and affection as well as a sense of justice and propriety, under all the circumstrances, and the mistake was in not making a will.  According to the evidence, the reason why a will was not made was that Finsterer believed the complainant would take by descent or inheritance.  He considered the complainant as his ultimate heir, and was too economical to incur the expense of verifying his opinion by competent legal advice.  It required a testamentary act to accomplish

his purpose, and from his ignorance of law he knew not that such an act was necessary. This was his mistake, and there is no indication in the evidence of any other. The evidence will be searched in vain for any mistake committed by Finsterer in taking conveyances when he made purchases of property. There is no hint or intimation that he intended or desired to be less than the absolute owner of all he possessed, or that he wished the complainant to take any estate in it other than what might be derived from or through him. While he expected and intended the complainant to succeed him in the ownership, his purpose was to postpone any change of ownership while he was in life, except as to the sums actually advanced and sent to the complainant. He felt as a father feels towards a son, and his purposes were shaped accordingly ; all his expressions, whether in the letters or in his parol declarations, are perfectly consistant with this hypothesis. Indeed, all the evidence points to this hypothesis and no other. There is not a syllable which, rightly interpreted, suggests any contract on his part to hold the property in trust, or any limit to his power over it restrictive of his title in fee simple. He expected to leave it behind him, and he expected the complainant to get it on the death of himself and wife, but if he had desired to sell it, or to give a part of it to another, he could have done so, and would have needed no consent or permission from the complainant. To claim a man's whole estate (including the earnings of himself and wife for fifteen years while they lived and labored apart from the claimant) by virtue of an alleged trust, extending to and embracing the whole, is a very strong proceeding, and one that requires very decisive evidence to maintain it. If the complainant were the son of Finsterer, and the only child, the evidence in the record would not substitute a trust for the laws of inheritance. He would take by descent and not by purchase. A step-father who receives and rears in his family a step-son, stands in *loco parentis*, and there is scarcely more presumption of contract rights between them

than between parent and child. 3 Comstock, 312; 5 Barb., 122; 11 *Ib.*, 224. As to a step-parent residing with a step-child, see 7 Cal., 511; niece with uncle, 17 Vt., 556; grand-child with grand-parent, 27 Vt., 715; children with parents, 3 Rawle, 243; 5 Watts & S., 513; 8 Penn. St., 213. The domestic affections delight in being bountiful both in ren-dering service and in rewarding it, and not unfrequently they express themselves in terms of liberality far beyond the measure of any obligation which, as matter of contract, they would be willing to assume. Much of the pleasure of exercising them would be lost if their generous promptings were in danger of being trammeled with the bonds of legal duty. There is need for tribunals to be on their guard against extracting legal obligations out of acts or expres-sions of parental kindness. In order for the complainant to prevail on the doctrine of a trust, his evidence ought to show that there was a trust and what were the terms of it. Browne on the Stat. of Frauds, §§108, 109; and the trust proved should correspond with that alleged in the bill, 5 Johns. Chan., 1. Indeed, if there was in fact such a con-tract as the bill shadows forth, one by which all the acquisi-tions of the family were to be for the common use of its original members during their joint lives, and after the death of the other two, then to become the absolute prop-erty of the complainant, the substance of the arrangement must have been in the nature somewhat of a covenant on the part of Finsterer to stand seized to uses, 4 Mass., 135; 7 Pick., 111; 10 Pa. St., 348; 4 Cruise Dig., (Greenleaf's) 106 *et seq.*

If we drop the idea of trust and treat the bill as in the nature of a bill for the specific performance of a direct con-tract of bargain and sale, there is still the same, or perhaps a greater, necessity for full proof of the precise contract alleged. Ambler, 586; 4 Md., 459; 1 Hilliard on Ven-dors, 449; 1 Story's Eq., §764; 3 Parsons on Con., 354; 1 Md. Chan. Dec., 345; 1 Johns. Chan., 131. The bill does not state the exact time when the contract was made, but

the allegation by the complainant is that "from the time he was a young boy until he reached the age of thirty years * * he gave all his earnings to his step-father, with the distinct understanding," etc. Finsterer was but little over thirty years of age when he was married, and if he made such a contract whilst the complainant was a young boy, and when he and his wife were perhaps better able to do efficient and profitable labor than was the complainant, to say nothing of the chance of Finsterer having issue of his own, it was quite extraordinary. The right by contract of a young boy to share in all the earnings of his mother and his step-father and in his own, whilst they should be in life, and after their death to take the whole, including all they earned and saved after he left them, is inconsistent with a right in the step-father to do as he pleased with the fruits of his own industry. Not even by a last will would he have a free disposing power over what would otherwise be his estate. Grant that it would be competent for a step-father to make such a contract with his step-son, and thereby deprive himself of the " possibility of realizing property over which he can have a disposing power by will, and the effect of which, therefore, is to destroy the most active motive for bettering his condition in life," (5 Mylne & C., 253) the proof that the contract was actually made ought, in its certainty and force, to bear some proportion to the improbability that a contract with such consequences would be entered into. In *Gary vs. Executors of James,* 4 *Dess.,* 185, the contract was express, and evidenced by a letter. In *Rhodes vs. Rhodes,* 3 *Sanf. Ch.,* 279, though the contract was in parol, and the evidence is not set out in the report, the actual making of the contract was established. In *Logan vs. McGinnis,* 12 *Penn. St.,* 27, the contract was in writing. It is laid down in 2 Red. on Wills, 281, 282, that a contract to leave a legacy as compensation will be enforced " provided there is clear evidence that the promise to leave the legacy was absolute, and for a definite amount." In *Lisk vs. Sherman,* 25 *Barb.,* 433, where the

contract was in parol and for that reason treated as not specifically enforceable, compensation was measured by the actual value of the services, and a recovery equal to the value of the estate left by the decedent was not allowed. In *Shakespeare vs. Markham* 72 *New York*, 400, it was held that the alleged agreement did not amount to a binding contract, or if so, was too uncertain to be enforced. In *Carlisle vs. Fleming*, 1 *Harr.*, 421, specific performance was denied, and the bill dismissed. Various cases as to the certainty of proof and the rule of compensation have been decided in Pennsylvania, some of which may be found in 34 Penn. St., 475; 71 *Ib.*, 161; 79 *Ib.*, 421; 85 *Ib.*, 428. And see the opinion of WOODWARD, J., 34 *Ib.*, 433. None of these cases, however, are in point on the present discussion further than they bear upon the requisites of general law concerning the fact of contract and the fulness and certainty of the evidence by which it is sought to be established. They inculcate a wholesome caution against building up imaginary contracts out of the expression of generous intentions towards persons who, having rendered service, prefer claims for compensation after those whom they served have been removed by death. And the caution is doubly necessary where the claim presented is not merely for just compensation on the basis of a *quantum meruit*, or to some specific article or articles of property, but goes to the entire estate, real and personal, which the decedent left behind him. Nor is it the less necessary because the heirs at law, if any there be, are remote rather than proximate kindred, or because they are foreigners. Every heir, and an heir of each degree and every nationality, must be secure of his inheritance, and one heir just as secure of it as another. By our law the complainant cannot take from his step-father otherwise than by purchase, and in order to exclude the heirs, if, in truth there be any, he must prove his right as purchaser. What he may be able to collect as a creditor, should he chose to claim in that character, we need not anticipate; nor need we pass on any possible title which

he could assert to an undivided interest in the property as a tenant in common with the deceased. Having struck for the whole estate, he has left out of his bill facts which would be necessary to any attempt at apportioning or *pro-rating*, nor does the evidence supply them.

The conclusions at which we have arrived, and which we have felt constrained to announce, are that the case made by the evidence as one for the enforcement of a trust, or for the specific performance of a contract, is too vague and uncertain to warrant a decree in the complainant's favor for the whole estate; that the actual making of any express contract is not proved with that distinctness which the rules of law require; that while it is certain that Leonard Finsterer intended the complainant to have the whole of his estate after the death of himself and wife, it is not apparent that this intention was the offspring or result of any contract to that effect, rather than of love and affection, a general sense of justice and propriety under the circumstances, coupled with the belief that the law would cast the property upon the complainant by descent or inheritance; and that, in the present state of the pleadings and evidence, the question of recovery by the complainant for wages to compensate him for his labor, or as a tenant in common in the general ownership of the property, or of some part thereof, is not presented, and is consequently not decided.

Judgment reversed.

JACKSON, Justice, concurred in deference to the judgment of the majority of the court, though with great doubts as to the legality and equity of the decision.