OYAMA ET AL. *v.* CALIFORNIA.

No. 44.   Argued October 22, 1947.—Decided January 19, 1948.

*A. L. Wirin* and *Dean G. Acheson* argued the cause for petitioners. With *Mr. Wirin* on the brief were *Charles A. Horsky, James C. Purcell, Guy C. Calden, Saburo Kido* and *Fred Okrand.*

*Everett W. Mattoon,* Deputy Attorney General of California, and *Duane J. Carnes* argued the cause for respondent. With them on the brief was *Fred N. Howser,* Attorney General.

Briefs of *amici curiae* urging reversal were filed by *James C. Purcell* for the Civil Rights Defense Union of

Northern California; and *Edwin Borchard, Edward J. Ennis, Osmond K. Fraenkel, Walter Gellhorn, Arthur Garfield Hays, Harold Evans* and *Benjamin Kizer* for the American Civil Liberties Union.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Petitioners challenge the constitutionality of California's Alien Land Law [1] as it has been applied in this case to effect an escheat of two small parcels of agricultural land.[2] One of the petitioners is Fred Oyama, a minor American citizen in whose name title was taken. The other is his father and guardian, Kajiro Oyama, a Japanese citizen not eligible for naturalization,[3] who paid the purchase price.

Petitioners press three attacks on the Alien Land Law as it has been applied in this case: first, that it deprives Fred Oyama of the equal protection of the laws and of his privileges as an American citizen; secondly, that it denies Kajiro Oyama equal protection of the laws; and, thirdly, that it contravenes the due process clause by sanctioning a taking of property after expiration of the

---

[1] 1 Cal. Gen. Laws, Act 261 (Deering 1944, 1945 Supp.).

[2] 29 Cal. 2d 164, 173 P. 2d 794 (1946).

[3] At the time the Alien Land Law was adopted the right to be naturalized extended only to free white persons and persons of African nativity or descent. In 1940, descendants of races indigenous to the Western Hemisphere were also made eligible, 54 Stat. 1140; in 1943 Chinese were made eligible, 57 Stat. 601; and in 1946 Filipinos and persons of races indigenous to India were made eligible, 60 Stat. 416, 8 U. S. C. A. § 703 (1946 Supp.). While it is not altogether clear whether the statute should be interpreted to include or to exclude certain peoples, see Note, 54 Harv. L. Rev. 860, 864–5 (1941), it seems to be accepted that Japanese are among the few groups not eligible for citizenship.

applicable limitations period. Proper foundation for these claims has been laid in the proceedings below.

In approaching cases, such as this one, in which federal constitutional rights are asserted, it is incumbent on us to inquire not merely whether those rights have been denied in express terms, but also whether they have been denied in substance and effect. We must review independently both the legal issues and those factual matters with which they are commingled.[4]

In broad outline, the Alien Land Law forbids aliens ineligible for American citizenship to acquire, own, occupy, lease, or transfer agricultural land.[5] It also provides that any property acquired in violation of the statute shall escheat as of the date of acquisition[6] and that the same result shall follow any transfer made with "intent to prevent, evade or avoid" escheat.[7] In addition, that intent is presumed, *prima facie,* whenever an ineligible alien pays the consideration for a transfer to a citizen or eligible alien.[8]

The first of the two parcels in question, consisting of six acres of agricultural land in southern California, was purchased in 1934, when Fred Oyama was six years old. Kajiro Oyama paid the $4,000 consideration, and the seller executed a deed to Fred. The deed was duly recorded.

Some six months later, the father petitioned the Superior Court for San Diego County to be appointed Fred's guardian, stating that Fred owned the six acres. After a hearing, the court found the allegations of the petition

---

[4] See *Patton* v. *Mississippi,* 332 U. S. 463 (1947); *Chambers* v. *Florida,* 309 U. S. 227, 228–9 (1940); *Norris* v. *Alabama,* 294 U. S. 587, 590 (1935).

[5] §§ 1 and 2.

[6] § 7.

[7] § 9.

[8] § 9 (a).

true and Kajiro Oyama "a competent and proper person" to be appointed Fred's guardian. The appointment was then ordered, and the father posted the necessary bond.

In 1936 and again in 1937, the father as guardian sought permission to borrow $4,000, payable in six months, for the purpose of financing the next season's crops and to mortgage the six-acre parcel as security. In each case notice of the petition and date for hearing was published in a newspaper, the court then approved the borrowing as advantageous to Fred Oyama's estate, and the father posted a bond for $8,000. So far as appears from the record, both loans were obtained, used for the benefit of the estate, and repaid on maturity.

The second parcel, an adjoining two acres, was acquired in 1937, when Fred was nine years old. It was sold by the guardian of another minor, and the court supervising that guardianship confirmed the sale "to Fred Oyama" as highest bidder at a publicly advertised sale. A copy of the court's order was recorded. Fred's father again paid the purchase price, $1,500.

From the time of the two transfers until the date of trial, however, Kajiro Oyama did not file the annual reports which the Alien Land Law requires of all guardians of agricultural land belonging to minor children of ineligible aliens.[9]

In 1942, Fred and his family were evacuated from the Pacific Coast along with all other persons of Japanese descent. And in 1944, when Fred was sixteen and still forbidden to return home, the State filed a petition to declare an escheat of the two parcels on the ground that the conveyances in 1934 and 1937 had been with intent to violate and evade the Alien Land Law.

---

[9] §§ 4 and 5. This was the holding of the state courts. Petitioners argue that until 1943 there was some doubt as to whether reports were required. See note 23, infra.

At the trial the only witness, other than a court official testifying to records showing the facts set forth above, was one John Kurfurst, who had been left in charge of the land at the time of the evacuation. He testified that the Oyama family once lived on the land but had not occupied it for several years before the evacuation. After the evacuation, Kurfurst and those to whom he rented the property drew checks to Fred Oyama for the rentals (less expenses), and Kurfurst transmitted them to Fred Oyama through the War Relocation Authority. The canceled checks were returned endorsed "Fred Oyama," and no evidence was offered to prove that the signatures were not by the son. Moreover, the receipts issued by the War Relocation Authority for the funds transmitted by Kurfurst were for the account of Fred Oyama, and Kurfurst identified a letter signed "Fred Oyama" directing him to turn the property over to a local bank for management.

On direct examination by the State's Attorney, however, Kurfurst also testified that he knew the father as "Fred," but he added that he had never heard the father refer to himself by that name. In addition, he testified on cross-examination that he had once heard the father say, "Some day the boy will have a good piece of property because that is going to be valuable." He also admitted that he knew "the father was running the boy's business" and that "the property belonged to the boy and to June Kushino" (Fred's cousin, an American citizen). Kurfurst further acknowledged that in a letter he had written about the property and had headed "Re: Fred Yoshihiro Oyama and June Kushino" he meant by "Fred Yoshihiro Oyama" the boy, not the father. He also understood a letter written to him by the War Relocation Authority "Re: Fred Oyama" to refer to the boy.

From this evidence the trial court found as facts that the father had had the beneficial use of the land and that

the transfers were subterfuges effected with intent to prevent, evade or avoid escheat. Accordingly, the court entered its conclusion of law that the parcels had vested in the State as of the date of the attempted transfers in 1934 and 1937.

The trial court filed no written opinion but indicated orally that its findings were based primarily on four inferences: (1) the statutory presumption that any conveyance is with "intent to prevent, evade or avoid" escheat if an ineligible alien pays the consideration;[10] (2) an inference of similar intent from the mere fact that the conveyances ran to a minor child;[11] (3) an inference of lack of bona fides at the time of the original transactions from the fact that the father thereafter failed to file annual guardianship reports; and (4) an inference from the father's failure to testify that his testimony would have been adverse to his son's cause. No countervailing inference was warranted by the exhibits in Fred's name, the judge said, "because there are many instances where there is little in a name."

In holding the trial court's findings of intent fully justified by the evidence, the Supreme Court of California pointed to the same four inferences. It also ruled that California could constitutionally exclude ineligible aliens from any interest in agricultural land,[12] and that Fred Oyama was deprived of no constitutional guarantees since

[10] § 9 (a) of the Alien Land Law.

[11] The judge stated that in the absence of a strong reason people just do not take title to real estate in the name of their seven-year-old children—thereby putting it beyond the power of the parents to deal with it directly, to deed it away, to borrow money on it and to make free disposition of it.

[12] This conclusion was based in large measure on a series of cases decided within a week of each other in 1923: *Terrace* v. *Thompson*, 263 U. S. 197; *Porterfield* v. *Webb*, 263 U. S. 225; *Webb* v. *O'Brien*, 263 U. S. 313; and *Frick* v. *Webb*, 263 U. S. 326.

the land had passed to the State without ever vesting in him.

We agree with petitioners' first contention, that the Alien Land Law, as applied in this case, deprives Fred Oyama of the equal protection of California's laws and of his privileges as an American citizen. In our view of the case, the State has discriminated against Fred Oyama; the discrimination is based solely on his parents' country of origin; and there is absent the compelling justification which would be needed to sustain discrimination of that nature.

By federal statute, enacted before the Fourteenth Amendment but vindicated by it, the states must accord to all citizens the right to take and hold real property.[13] California, of course, recognizes both this right and the fact that infancy does not incapacitate a minor from holding realty.[14] It is also established under California law that ineligible aliens may arrange gifts of agricultural land to their citizen children.[15] Likewise, when a minor citizen does become the owner of agricultural land, by gift or otherwise, his father may be appointed guardian of the estate, whether the father be a citizen, an eligible alien, or an ineligible alien.[16] And, once appointed, a guardian is

---

[13] "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." R. S. § 1978, 8 U. S. C. § 42.

[14] The State in its brief concedes that this is so. See also *Estate of Yano*, 188 Cal. 645, 649, 206 Pac. 995, 998 (1922); *People* v. *Fujita*, 215 Cal. 166, 169, 8 P. 2d 1011, 1012 (1932).

[15] The State also concedes the accuracy of this proposition. See also *People* v. *Fujita, supra* note 14.

[16] A statute of general applicability requires that parents be given preference in the appointment of a minor's guardian. Cal. Prob. Code Ann. § 1407.

Section 4 of the Alien Land Law, as enacted in 1920, prohibited an ineligible alien from becoming the guardian of that part of his

entitled to have custody of the estate and to manage and husband it for the ward's benefit.[17]    To that extent Fred Oyama is ostensibly on a par with minors of different lineage.

At this point, however, the road forks.   The California law points in one direction for minor citizens like Fred Oyama, whose parents cannot be naturalized, and in another for all other children—for minor citizens whose parents are either citizens or eligible aliens, and even for minors who are themselves aliens though eligible for naturalization.

In the first place, for most minors California has the customary rule that where a parent pays for a conveyance to his child there is a presumption that a gift is intended; there is no presumption of a resulting trust, no presumption that the minor takes the land for the benefit of his parent.[18]   When a gift is thus presumed and the deed is recorded in the child's name, the recording suffices for delivery,[19] and, absent evidence that the gift is disadvantageous, acceptance is also presumed.[20]   Thus the burden of proving that there was in fact no completed bona fide gift falls to him who would attack its validity.

child's estate which consisted of agricultural land.   Cal. Stats. 1921, p. lxxxiii.   This section was held unconstitutional in *Estate of Yano, supra* note 14.

[17] See *DeGreayer* v. *Superior Court,* 117 Cal. 640, 49 Pac. 983 (1897).

[18] *Gomez* v. *Cecena,* 15 Cal. 2d 363, 101 P. 2d 477 (1940); *Quinn* v. *Reilly,* 198 Cal. 465, 245 Pac. 1091 (1926); *Russ* v. *Mebius,* 16 Cal. 350 (1860); *cf. Lezinsky* v. *Mason Malt Whiskey Distilling Co.,* 185 Cal. 240, 250, 196 Pac. 884, 889 (1921); *Hamilton* v. *Hubbard,* 134 Cal. 603, 605, 65 Pac. 321, 322 (1901).

[19] *People* v. *Fujita,* 215 Cal. 166, 169, 8 P. 2d 1011, 1012 (1932); *Estate of Yano,* 188 Cal. 645, 649, 206 Pac. 995, 998 (1922); *cf. Turner* v. *Turner,* 173 Cal. 782, 786, 161 Pac. 980, 982 (1916).

[20] *People* v. *Fujita* and *Estate of Yano,* both *supra* note 19; *DeLevillain* v. *Evans,* 39 Cal. 120, 123 (1870).

Fred Oyama, on the other hand, faced at the outset the necessity of overcoming a statutory presumption that conveyances financed by his father and recorded in Fred's name were not gifts at all. Something very akin to a resulting trust *was* presumed and, at least *prima facie,* Fred *was* presumed to hold title for the benefit of his parent.[21]

In the second place, when it came to rebutting this statutory presumption, Fred Oyama ran into other obstacles which, so far as we can ascertain, do not beset the path of most minor donees in California.

Thus the California courts said that the very fact that the transfer put the land beyond the father's power to deal with it directly—to deed it away, to borrow money on it, and to make free disposition of it in any other way—showed that the transfer was not complete, that it was merely colorable. The fact that the father attached no strings to the transfer was taken to indicate that he meant, in effect, to acquire the beneficial ownership himself. The California law purports to permit citizen sons to take gifts of agricultural land from their fathers, regardless of the fathers' nationality. Yet, as indicated by this case, if the father is ineligible for citizenship, facts which would usually be considered indicia of the son's ownership are used to make that ownership suspect; if the father is not an ineligible alien, however, the same facts would be evidence that a completed gift was intended.

Furthermore, Fred Oyama had to counter evidence that his father was remiss in his duties as guardian. Acts

---

[21] It is interesting to note that in two previous cases the California Supreme Court has explicitly stated that where aliens are prohibited from holding lands, an implied trust by operation of law will not arise in their favor. *Estate of Yano* and *People* v. *Fujita,* both *supra,* note 19. Both cases were decided before purchase of either of the parcels involved in this case and at the time of the purchase apparently represented the established State law.

subsequent to a transfer may, of course, be relevant to indicate a transferor's intent at the time of the transfer. In this case the trial court itself had reservations as to the evidentiary value of the father's omissions; [22] with these we agree, especially because there was some reason to believe reports were not required of him until 1943, [23] and he had been excluded from the state from 1942 on. More important to the issue of equal protection, however, our attention has been called to no other case in which the penalty for a guardian's derelictions has fallen on any one but the guardian. At any time the court supervising the guardianship could have demanded the annual accounts and, if appropriate, could have removed Kajiro Oyama as guardian; severe punishment could also have been meted out.[24] The whole theory of

[22] While relying to some extent on this inference the trial court indicated that it did not consider it a strong one "because sometimes people who are not informed as to the requirements of the law in connection with those matters simply fail to do the thing that the law requires."

[23] Section 4 of the Alien Land Law, as amended in 1920, prohibited ineligible aliens from becoming guardians of agricultural land owned by their minor children, Cal. Stats. 1921, p. lxxxiii, while § 5 required certain reports of persons who could and did become guardians of such land—*i. e.*, persons other than the parents. Section 4 was held invalid in 1922 in *Estate of Yano, supra* note 21, and was not replaced until 1943, when there was enacted a new § 4 enunciating requirements for ineligible alien guardians. Section 5 has remained on the books continuously.

Petitioners argue that there may have been at least a justifiable belief on the part of ineligible aliens such as Kajiro Oyama that they were not required to file guardianship reports until 1943. As inferential corroboration of this view, they point to the failure of both the guardianship court and the district attorney to take action against Kajiro Oyama under § 5 between 1935 and 1943.

[24] If, as the State contends, § 5 of the Act required Kajiro Oyama to file annual reports, the same section set as the penalty for violation a fine up to $1,000 and imprisonment up to a year. Other statutes of general applicability subject guardians to the law of trusts and

guardianships is to protect the ward during his period of incapacity to protect himself. In Fred Oyama's case, however, the father's deeds were visited on the son; the ward became the guarantor of his guardian's conduct.

The cumulative effect, we believe, was clearly to discriminate against Fred Oyama. He was saddled with an onerous burden of proof which need not be borne by California children generally. The statutory presumption and the two ancillary inferences, which would not be used against most children, were given such probative value as to prevail in the face of a deed entered in the public records, four court orders recognizing Fred Oyama as the owner of the land, several newspaper notices to the same effect, and testimony that business transactions regarding the land were generally understood to be on his behalf. In short, Fred Oyama lost his gift, irretrievably and without compensation, solely because of the extraordinary obstacles which the State set before him.

The only basis for this discrimination against an American citizen, moreover, was the fact that his father was Japanese and not American, Russian, Chinese, or English. But for that fact alone, Fred Oyama, now a little over a year from majority, would be the undisputed owner of the eight acres in question.

The State argues that racial descent is not the basis for whatever discrimination has taken place. The argument is that the same statutory presumption of fraud would apply alike to any person taking agricultural land paid for by Kajiro Oyama, whether the recipient was Fred Oyama or a stranger of entirely different ancestry. We do not know how realistic it is to suppose that Kajiro

authorize the court to remove a guardian for mismanagement or failure to render accounts. Cal. Prob. Code §§ 1400, 1580. Furthermore, since 1943 the statute has provided that breach of § 4 may subject the guardian to a maximum of 10 years' imprisonment and a $5,000 fine.

Oyama would attempt gifts of land to others than his close relatives. But in any event, the State's argument ignores the fact that the generally applicable California law treats conveyances to the transferor's children differently from conveyances to strangers. Whenever a Chinese or English parent, to take an example, pays a third party to deed land to a stranger, a resulting trust is presumed to arise, and the stranger is presumed to hold the land for the benefit of the person paying the consideration;[25] when the Alien Land Law applies a similar presumption to a like transfer by Kajiro Oyama to a stranger, it appears merely to reiterate the generally applicable law of resulting trusts. When, on the other hand, the same Chinese or English father uses his own funds to buy land in his citizen son's name, an indefeasible title is presumed to vest in the boy;[26] but when Kajiro Oyama arranges a similar transfer to Fred Oyama, the Alien Land Law interposes a presumption just to the contrary. Thus, as between the citizen children of a Chinese or English father and the citizen children of a Japanese father, there is discrimination; as between strangers taking from the same transferors, there appears to be none.

It is for this reason that *Cockrill* v. *California*, 268 U. S. 258 (1925), does not support the State's position. In that case an ineligible alien paid for land and had title put in a stranger's name, and this Court affirmed a decision upholding the statutory presumption of the Alien Land Law as there applied.[27]

[25] Cal. Civil Code § 853.

[26] See note 18 *supra.*

[27] In the *Cockrill* case the ineligible alien, one Ikada, first attempted to purchase the land in his own name. When the seller questioned the legality of the transfer, it was arranged for title to be put in the name of Cockrill, Ikada's attorney. That was done, and immediately on execution of the contract of sale, Ikada himself entered into possession. There was some evidence that the land was purchased and was being held for Ikada's American-born children, but a jury found

There remains the question of whether discrimination between citizens on the basis of their racial descent, as revealed in this case, is justifiable. Here we start with the proposition that only the most exceptional circumstances can excuse discrimination on that basis in the face of the equal protection clause and a federal statute giving all citizens the right to own land.[28] In *Hirabayashi* v. *United States,* this Court sustained a war measure which involved restrictions against citizens of Japanese descent. But the Court recognized that, as a general rule, "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." 320 U. S. 81, 100 (1943).

The only justification urged upon us by the State is that the discrimination is necessary to prevent evasion of the Alien Land Law's prohibition against the ownership of agricultural land by ineligible aliens. This reasoning presupposes the validity of that prohibition, a premise which we deem it unnecessary and therefore inappropriate to reexamine in this case. But assuming, for purposes of argument only, that the basic prohibition is constitutional, it does not follow that there is no consti-

---

Ikada and Cockrill guilty of conspiracy to violate the Alien Land Law. In affirming, the California appellate court pointed out that no move had been made toward having a guardian appointed for the children. 62 Cal. App. 22, 45, 216 Pac. 78, 88. Before this Court Ikada and Cockrill argued that the statutory presumption denied equal protection to the Japanese, not to the donee as in the present case.

Since we do not reach petitioners' second argument, that it is unconstitutional for a state to forbid the ownership of land by an ineligible alien, we do not think it appropriate to reexamine either the cases cited in note 12, *supra,* or the necessary implication in the *Cockrill* case that the basic prohibition of the Alien Land Law is valid.

[28] See note 13 *supra.*

tutional limit to the means which may be used to enforce it. In the light most favorable to the State, this case presents a conflict between the State's right to formulate a policy of landholding within its bounds and the right of American citizens to own land anywhere in the United States. When these two rights clash, the rights of a citizen may not be subordinated merely because of his father's country of origin.

Since the view we take of petitioners' first contention requires reversal of the decision below, we do not reach their other contentions: that the Alien Land Law denies ineligible aliens the equal protection of the laws, and that failure to apply any limitations period to escheat actions under that law takes property without due process of law.

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS agrees, concurring.

I concur in the Court's judgment and its opinion. But I should prefer to reverse the judgment on the broader grounds that the basic provisions of the California Alien Land Law violate the equal protection clause of the Fourteenth Amendment and conflict with federal laws and treaties governing the immigration of aliens and their rights after arrival in this country. The California law in actual effect singles out aliens of Japanese ancestry, requires the escheat of any real estate they own, and its language is broad enough to make it a criminal offense, punishable by imprisonment up to ten years, for them to acquire, enjoy, use, possess, cultivate, occupy, or transfer real property.[1] It would therefore appear to be a crime

[1] Section 10 (a) of the Alien Property Initiative Act provides: "Any person who violates any of the provisions of this act shall be punishable by imprisonment in the county jail not to exceed one

for an alien of Japanese ancestry to own a home in California, at least if the land around it is suitable for cultivation.[2] This is true although the statute does not name the Japanese as such, and although its terms also apply to a comparatively small number of aliens from other countries. That the effect and purpose of the law is to discriminate against Japanese because they are Japanese is too plain to call for more than a statement of that well-known fact.

We are told, however, that, despite the sweeping prohibition against Japanese ownership or occupancy, it is no violation of the law for a Japanese to work on land as a hired hand for American citizens or for foreign nationals permitted to own California lands. And a Japanese man or woman may also use or occupy land if acting only in the capacity of a servant. In other words, by this Alien Land Law California puts all Japanese aliens within its boundaries on the lowest possible economic level. And this Land Law has been followed by another which now bars Japanese from the fishing industry. Cal. Stats. 1945, c. 181; see *Takahashi* v. *Fish & Game Comm'n*, 30 Cal. 2d

---

year or in the State penitentiary not exceeding 10 years, or by a fine not to exceed five thousand dollars ($5,000) or both." Section 2 of the Act provides that aliens ineligible for citizenship "may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein" in California only to the extent allowed by treaty between the United States and the nation of which the alien is a citizen.

[2] The United States-Japanese Treaty of 1911, which guaranteed Japanese in this country the right to own and lease land "for residential and commercial purposes," 37 Stat. 1504, was abrogated effective January 26, 1940. Dept. of State Bull., July 29, 1939, p. 81. Since the abrogation of this treaty, it is doubtful whether Japanese aliens in California may own or rent a home or a business. We are told that a recent intermediate court decision upholding the right of Japanese aliens to rent a building for business purposes, *Palmero* v. *Stockton Theatres*, 172 P. 2d 103 (1946), has been appealed to the Supreme Court of California.

719, 185 P. 2d 805. If there is any one purpose of the Fourteenth Amendment that is wholly outside the realm of doubt, it is that the Amendment was designed to bar States from denying to some groups, on account of their race or color, any rights, privileges, and opportunities accorded to other groups. I would now overrule the previous decisions of this Court that sustained state land laws which discriminate against people of Japanese origin residing in this country.[3]

Congress has provided strict immigration tests and quotas. It has also enacted laws to regulate aliens after admission into the country. Other statutes provide for deportation of aliens. Although Japanese are not permitted to become citizens by the ordinary process of naturalization, still Congress permitted the admission of some Japanese into this country. All of this means that Congress, in the exercise of its exclusive power over immigration, *Truax* v. *Raich,* 239 U. S. 33, 42, decided that certain Japanese, subject to federal laws, might come to and live in any one of the States of the Union. The Supreme Court of California has said that one purpose of that State's Land Law is to "discourage the coming of Japanese into this state . . . ." *Estate of Yano,* 188 Cal. 645, 658, 206 P. 995, 1001. California should not be permitted to erect obstacles designed to prevent the immigration of people whom Congress has authorized to come into and remain in the country. See *Hines* v. *Davidowitz,* 312 U. S. 52, 68. There are additional reasons now why that law stands as an obstacle to the free accomplishment of our policy in the international field. One of these reasons is that we have recently pledged ourselves to cooperate with the United Nations to "promote . . . universal respect for, and observance of, human rights and fundamen-

---

[3] *Terrace* v. *Thompson,* 263 U. S. 197; *Porterfield* v. *Webb,* 263 U. S. 225; *Webb* v. *O'Brien,* 263 U. S. 313; *Frick* v. *Webb,* 263 U. S. 326.

tal freedoms for all without distinction as to race, sex, language, or religion."[4]  How can this nation be faithful to this international pledge if state laws which bar land ownership and occupancy by aliens on account of race are permitted to be enforced?

MR. JUSTICE MURPHY, with whom MR. JUSTICE RUTLEDGE joins, concurring.

To me the controlling issue in this case is whether the California Alien Land Law on its face is consistent with the Constitution of the United States.  Can a state prohibit all aliens ineligible for American citizenship from acquiring, owning, occupying, enjoying, leasing or transferring agricultural land?  Does such a prohibition square with the language of the Fourteenth Amendment that no state shall "deny to any person within its jurisdiction the equal protection of the laws"?

The negative answer to those queries is dictated by the uncompromising opposition of the Constitution to racism, whatever cloak or disguise it may assume.  The California statute in question, as I view it, is nothing more than an outright racial discrimination.  As such, it deserves constitutional condemnation.  And since the very core of the statute is so defective, I consider it necessary to give voice to that fact even though I join in the opinion of the Court.

In its argument before us, California has disclaimed any implication that the Alien Land Law is racist in its origin, purpose or effect.  Reference is made to the fact that nowhere in the statute is there a single mention of race, color, creed or place of birth or allegiance as a determinant of who may not own or hold farm land. The discrimination established by the statute is said to

---

[4] United Nations Charter, Articles 55c and 56; 59 Stat. 1045, 1046 (1945).

be entirely innocent of the use of such factors, being grounded solely upon the reasonable distinctions created by Congress in its naturalization laws. However, an examination of the circumstances surrounding the original enactment of this law in 1913, its reenactment in 1920 and its subsequent application reveals quite a different story.[1]

The California Alien Land Law was spawned of the great anti-Oriental virus which, at an early date, infected many persons in that state. The history of this anti-Oriental agitation is not one that does credit to a nation that prides itself, at least historically, on being the friendly haven of the tired and the oppressed of other lands. Beginning in 1850, with the arrival of substantial numbers of Chinese immigrants, racial prejudices and discriminations began to mount. Much of the opposition to these Chinese came from trade unionists, who feared economic competition, and from politicians, who sought union support. Other groups also shared in this opposition. Various laws and ordinances were enacted for the purpose of discouraging the immigrants and dramatizing

---

[1] The story is a familiar one and has been told many times. See the following sources:

*Treatises.*—Millis, The Japanese Problem in the United States (1915); Ichihashi, Japanese in the United States (1932); Strong, The Second Generation Japanese Problem (1934); McWilliams, Prejudice (1944); Konvitz, The Alien and the Asiatic in American Law (1946), ch. 5.

*Articles.*—Buell, "The Development of Anti-Japanese Agitation in the United States," 37 Pol. Sci. Q. 605, 38 *id.* 57; Bailey, "California, Japan, and the Alien Land Legislation of 1913," 1 Pac. Hist. Rev. 36; McGovney, "The Anti-Japanese Land Laws of California and Ten Other States," 35 Calif. L. Rev. 7; Ferguson, "The California Alien Land Law and the Fourteenth Amendment," 35 Calif. L. Rev. 61; Comment, 56 Yale L. J. 1017.

*Government Publications.*—H. R. Rep. No. 2124, 77th Cong., 2d Sess.; U. S. Dept. of Interior, W. R. A., People in Motion: The Postwar Adjustment of the Evacuated Japanese Americans (1947).

652

the native dissatisfaction. Individual Chinese were sub-
jected to many acts of violence. Eventually, Congress
responded to this popular agitation and adopted Chinese
exclusion laws.

It was not until 1900 that Japanese began to arrive
in California in large numbers. By that time the repres-
sive measures directed at the Chinese had achieved much
of their desired effect; the Chinese population had mate-
rially decreased and the antipathy of the Americans was
on the decline. But the arrival of the Japanese fanned
anew the flames of anti-Oriental prejudice. History then
began to repeat itself. White workers resented the new
influx, a resentment which readily lent itself to political
exploitation. Demands were made that Japanese immi-
gration be limited or prohibited entirely.[2] Numerous

[2] "In November of 1904 the American Federation of Labor, in
annual convention in San Francisco, resolved to exclude Japanese
and Korean, as well as Chinese laborers. The San Francisco Chron-
icle in February 1905 began the publication of a series of articles
captioned: 'Crime and Poverty Go Hand in Hand with Asiatic Labor,'
'Brown Men an Evil in the Public Schools,' 'Japanese a Menace to
American Women,' 'Japs Throttle Progress in the Rich Fruit Section.'
The campaign was immediately effective. In early March the Cali-
fornia Legislature, followed by the Nevada Legislature, passed a
resolution demanding immediate action to limit the immigration of
Japanese laborers. And in May 1905 the Asiatic Exclusion League,
originally the Japanese and Korean Exclusion League, was organized
in San Francisco . . . .

"The avowed purpose of the league was to preserve North America
for Americans, by preventing or minimizing the immigration of Asi-
atics, who were said to be unassimilable, and ill-suited to complement
the machine processes of American industrial life. The league de-
clared itself in favor of segregation of Japanese in the schools and a
boycott against Japanese workers and businessmen. In California
alone, it was claimed that membership of the league was 110,000 in
February of 1908. Of the 238 affiliated bodies composing the league,
202 were labor unions; the rest were fraternal, civic, benevolent,
political, and military societies." H. R. Rep. No. 2124, 77th Cong.,
2d Sess., pp. 72–73.

acts of violence were perpetrated against Japanese businessmen and workers, combined with private economic sanctions designed to drive them out of business. Charges of espionage, unassimilativeness, clannishness and corruption of young children were made against these "Mongolian invaders." Campaigns were organized to secure segregated schools and to preserve "America for the Americans."

Indeed, so loud did this anti-Japanese clamor become that the Japanese Government made formal protests to the United States. President Theodore Roosevelt thereupon investigated and intervened in the California situation. He was able to secure a slight amelioration. Further negotiations with the Japanese Government resulted in a so-called "gentlemen's agreement," whereby the Japanese Government agreed to limit passports to the United States to nonlaborers and to others who had already established certain business and personal interests in this country.[3]

But the agitation did not die and anti-Japanese measures continued to be proposed in wholesale fashion. The first anti-Japanese land bills were introduced in the California legislature in 1907, but the combined efforts of President Roosevelt and Governor Gillett prevented their passage. At least seventeen anti-Japanese bills were introduced in the 1909 session, including another land bill. President Roosevelt again intervened. This time he succeeded in having the land bill amended to apply to all aliens, as a result of which the bill was defeated;[4] he was also instrumental in preventing the

---

[3] See Ichihashi, Japanese in the United States (1932), ch. XVI.

[4] During the legislative debate on this bill, one of the assemblymen stated: "I would rather every foot of California was in its native wilderness than to be cursed by the foot of these yellow invaders, who are a curse to the country, a menace to our institutions, and destructive of every principle of Americanism. I want no aliens, white, red,

654

passage of a school segregation bill. The flood of anti-Japanese proposals continued in the 1911 session, at which more than twenty such measures were introduced. Among them, of course, was still another alien land bill. It provided that "no alien who is not eligible to citizenship" should hold real property in California. The prospects for the passage of this bill seemed good, for by this time all political parties in the state had anti-Japanese planks in their platforms. But Presidential intervention was once again successful and the bill died in committee.[5]

In 1913, however, nothing could stop the passage of the original version of what is now the Alien Land Law.[6] This measure, though limited to agricultural lands, represented the first official act of discrimination aimed at the Japanese. Many Japanese were engaged in agricultural pursuits in 1913 and they constituted a substantial segment of the California farm labor supply. From 1900 to 1910, Japanese-controlled farms in California had in-

---

black or yellow, to own a foot of land in the State of California." Another assemblyman said that he intensely and unalterably hated the Japanese, whom he characterized as "a bandy-legged bagaboo, miserable craven Simian, degenerated rotten little devil." From the San Francisco Chronicle, February 3, 1909, quoted in Ichihashi, Japanese in the United States (1932), p. 262.

[5] Also opposing the bill at this time was the Panama Pacific Exposition Company and its supporters. They desired not to antagonize Japan and thus jeopardize the chances of Japan's participation in the exposition, which was soon to be held at San Francisco.

[6] "By 1913 the political situation was ripe for the passage of an anti-Japanese land law. The state administration in California remained Progressive Republican while the national administration became Democratic and exercised less influence over the state legislature. The Exposition had progressed to the point where the appeal for its success was no longer sufficiently effective. Opposition to the bill came only from a few relatively ineffective groups." Ferguson, "The California Alien Land Law and the Fourteenth Amendment," 35 Calif. L. Rev. 61, 66.

creased from 4,698 acres to 99,254 acres. The agricultural situation thus offered a fruitful target for the anti-Japanese forces, who had been balked in their attempts to secure a ban on all Japanese immigration and to outlaw Japanese acquisition and enjoyment of residential and commercial property. In this new endeavor they were eminently successful. Secretary of State Bryan, acting on behalf of President Wilson, made a personal appearance in California to plead for caution, but his request was ignored as the legislators voted overwhelmingly in favor of the bill. This 1913 law denied "aliens ineligible to citizenship" the privilege of buying land for agricultural purposes in California, and allowed them to lease land for such purposes for no more than three years. The measure was so drawn as not to be inconsistent with the Japanese-American treaty of 1911, which authorized Japanese in this country to lease and occupy land for residential and commercial purposes. But since the treaty made no mention of agricultural land, legislation on the matter by California did not present a square conflict.

The passage of the law was an international incident. The Japanese Government made an immediate protest on the ground that the statute was an indication of unfriendliness towards its people. Indeed, the resentment was so violent inside Japan that demands were made that war be declared against the United States. Anti-American agitation grew rapidly.[7] The question

---

[7] "The land act could not have been passed at a more inopportune time. Shortly prior to its adoption, this country had aroused considerable resentment in Japan by its recognition of the newly established Chinese Republic. . . . Furthermore the land act was passed, as Mr. A. M. Pooley has pointed out, 'shortly after the Tokio mob had succeeded in shattering the third Katsura Ministry.' Passage of the bill occasioned violent resentment in Japan. 'Revelling in the recent discovery of its power,' writes Mr. Pooley, 'the mob, inflamed by the opposition, endeavored to use the same methods to force a

was discussed at length on the diplomatic level. It was declared by the Japanese Minister of Foreign Affairs that the statute "is essentially unfair and invidiously discriminatory against my countrymen, and inconsistent as well with the sentiments of amity and good neighborhood which have presided over the relations between the two countries . . . ."[8] But the matter was allowed to lapse as both countries became increasingly occupied with the developments of World War I.

The intention of those responsible for the 1913 law was plain. The "Japanese menace" was to be dealt with on a racial basis. The immediate purpose, of course, was to restrict Japanese farm competition. As subsequently stated by Governor Stephens of California, "In 1913 the Legislature of this state passed a statute forbidding the ownership of agricultural lands by Japanese and limiting their tenure to three-year leaseholds. It was the hope at that time that the enactment of this statute might put a stop to the encroachments of the Japanese agriculturist."[9] Actually, however, the law had little effect on the

settlement of the California question on the government' that it had used in ousting the Katsura Ministry. Throughout April and May, 1913, the Japanese press adopted a most threatening and truculent tone. California newspapers on April 18, 1913, carried a dispatch from Tokyo to the effect that 'a demand that Japan resort to arms was hysterically cheered at a mass meeting here tonight to protest against the alien land bill now pending before the California legislature. Twenty thousand persons assembled.'

" 'More unfortunate still,' observed Mr. Pooley, 'the wave of excitement grew under the stimulus of anti-American societies formed by men in responsible positions. The agitation of April and May, 1913, became a national movement and of such volume that the Government had to pay respect to it. The anti-American movement spread, associations sprang up like mushrooms to deal with the matter.' " McWilliams, Prejudice (1944), p. 46.

[8] Quoted in Ichihashi, Japanese in the United States (1932), p. 274.

[9] Report of California State Board of Control, California and the Oriental (1920), p. 11.

farm situation. It failed to prohibit the acquisition of farms in the future or to divest any existing holdings; and there was no limitation on the renewal of leases. The Japanese farm population remained largely intact.

The more basic purpose of the statute was to irritate the Japanese, to make economic life in California as uncomfortable and unprofitable for them as legally possible. It was thus but a step in the long campaign to discourage the Japanese from entering California and to drive out those who were already there. The Supreme Court of California admitted as much in its statement that the Alien Land Law was framed so as "to discourage the coming of Japanese into this state." *Estate of Tetsubumi Yano,* 188 Cal. 645, 658, 206 P. 995, 1001. Even more candid was the declaration in 1913 by Ulysses S. Webb, one of the authors of the law and an Attorney General of California. He stated: "The fundamental basis of all legislation upon this subject, State and Federal, has been, and is, race undesirability. It is unimportant and foreign to the question under discussion whether a particular race is inferior. The simple and single question is, is the race desirable . . . . It [the Alien Land Law] seeks to limit their presence by curtailing their privileges which they may enjoy here; for they will not come in large numbers and long abide with us if they may not acquire land. And it seeks to limit the numbers who will come by limiting the opportunities for their activity here when they arrive." [10]

---

[10] From a speech before the Commonwealth Club of San Francisco on August 9, 1913, quoted in Ichihashi, Japanese in the United States (1932), p. 275.

Apparently one factor which, in Mr. Webb's mind, made the Japanese an "undesirable" race was their efficiency in agricultural production. In a brief signed by him and submitted to this Court in *Porterfield* v. *Webb,* 263 U. S. 225 (No. 28, OT 1923), p. 25, he stated:

"The fundamental question is not one of race discrimination. It

Further evidence of the racial prejudice underlying the Alien Land Law is to be found in the events relating to the reenactment and strengthening of the statute by popular initiative in 1920. More severe and effective than the 1913 law, the initiative measure prohibited ineligible aliens from leasing land for agricultural purposes; and it plugged various other loopholes in the earlier provisions. A spirited campaign was waged to secure popular approval, a campaign with a bitter anti-Japanese flavor. All the propaganda devices then known—newspapers, speeches, films, pamphlets, leaflets, billboards, and the like—were utilized to spread the anti-Japanese poison.[11] The Japanese were depicted as

---

is a question of recognizing the obvious fact that the American farm, with its historical associations of cultivation, environment, and including the home life of its occupants, can not exist in competition with a farm developed by Orientals with their totally different standards and ideas of cultivation of the soil, of living and social conditions.

"If the Oriental farmer is the more efficient, from the standpoint of soil production, there is just that much greater certainty of an economic conflict which it is the duty of statesmen to avoid.

"The conservative and intelligent statesmen of Japan have recognized this truth just as fully as have those of America. It is far better to have an occasional outburst from extremists who refuse to recognize the underlying reason for such legislation, than to permit of a condition that would lead to results far more serious from the standpoint of the friendly relations of the two nations."

[11] "In point of virulence, the 1920 agitation far exceeded any similar demonstration in California. In support of the initiative measures, the American Legion exhibited a motion picture throughout the state entitled 'Shadows of the West.' All the charges ever made against the Japanese were enacted in this film. The film showed a mysterious room fitted with wireless apparatus by which 'a head Japanese ticked out prices which controlled a state-wide vegetable market'; spies darted in and out of the scenes, Japanese were shown dumping vegetables into the harbor to maintain high prices; two white girls were abducted by a group of Japanese men only to be rescued, at the last moment, by a squad of American Legionnaires. When meetings were called to protest the exhibition of this scurrilous film, the meetings were broken up." McWilliams, Prejudice (1944), p. 60.

degenerate mongrels and the voters were urged to save "California—the White Man's Paradise" from the "yellow peril," which had somewhat lapsed in the public mind since 1913. Claims were made that the birth rate of the Japanese was so high that the white people would eventually be replaced and dire warnings were made that the low standard of living of the Japanese endangered the economic and social health of the community. Opponents of the initiative measure were labeled "Jap-lovers." The fires of racial animosity were thus rekindled and the flames rose to new heights.

In a pamphlet officially mailed to all voters prior to the election, they were told that the primary purpose of the new measure was "to prohibit Orientals who cannot become American citizens from controlling our rich agricultural lands . . . . Orientals, and more particularly Japanese, [have] commenced to secure control of agricultural lands in California . . . ." [12] The arguments in the pamphlet in support of the measure were repeatedly directed against the Japanese alone, without reference to other Orientals or to others who were ineligible for American citizenship. In this atmosphere heavy with race hatred, the voters gave decisive approval to the proposal, 668,483 to 222,086, though the majority constituted less than half of the total electorate. But so virulent had been the campaign and so deep had been the natural resentment in Japan that once again the threat of war appeared on the horizon, only to die in the rush of other events.

It is true that the Alien Land Law, in its original and amended form, fails to mention Japanese aliens by name. Some of the proposals preceding the adoption of the original measure in 1913 had in fact made specific refer-

---

[12] From the pamphlet, "Argument in Favor of Proposed Alien Land Law," quoted in McGovney, "The Anti-Japanese Land Laws of California and Ten Other States," 35 Calif. L. Rev. 7, 14.

ence to Japanese aliens. But the expansion of the discrimination to include all aliens ineligible for citizenship did not indicate any retreat from the avowed anti-Japanese purpose. Adoption of the Congressional standard of ineligibility for citizenship was only an indirect, but no less effective, means of achieving the desired end. The federal legislation at all pertinent times has been so drawn as to exclude Japanese aliens from American citizenship.[13] This Court has said, in referring to such legislation, that "a person of the Japanese race, if not born a citizen, is ineligible to become a citizen, i. e., to be naturalized." *Morrison* v. *California*, 291 U. S. 82, 85. The framers of the California law were therefore able to utilize the federal standard with full assurance that the result would be to exclude Japanese aliens from the ownership and use of farm land. Congress supplied a ready-made vehicle for discriminating against Japanese aliens, a vehicle which California was prompt to grasp and expand to purposes quite beyond the scope or object of the Congressional statute.

Moreover, there is nothing to indicate that the proponents of the California law were at any time concerned with the use or ownership of farm land by ineligible aliens other than those of Japanese origin. Among those ineligible for citizenship when the law was under consideration were Chinese aliens. But the Chinese in California were generally engaged in small commercial

---

[13] See 8 U. S. C. § 703, as last amended on July 2, 1946, 60 Stat. 416. This extends the right to become a naturalized citizen only to white persons, persons of African nativity or descent, persons who are descendants of races indigenous to the continents of North or South America or adjacent islands, Filipino persons, Chinese persons and persons of Chinese descent, and persons of races indigenous to India. But Chinese and Hindus were not eligible at the time the Alien Land Law was under consideration.

enterprises rather than in agricultural occupations and, in addition, were not considered a menace because of the Chinese exclusion acts.[14] No mention was made by the statute's proponents of the Hindus or the Malay and Polynesian aliens who were resident in California. Aliens of the latter types were so numerically insignificant as to arouse no interest or animosity.[15] Only the Japanese aliens presented the real problem. It was they, the "yellow horde," who were the object of the legislation.

That fact has been further demonstrated by the subsequent enforcement of the Alien Land Law. At least 79 escheat actions have been instituted by the state since the statute became effective. Of these 79 proceedings, 4 involved Hindus, 2 involved Chinese and the remaining 73 involved Japanese.[16] Curiously enough, 59 of the 73 Japanese cases were begun by the state subsequent to Pearl Harbor, during the period when the hysteria generated by World War II magnified the opportunities for

---

[14] "The people of that state [California] did not object particularly to Chinese and negroes, who were racially different but who stayed in their place. But they did object to the Japanese because they were efficient, thrifty, ambitious, and, above all, unwilling to remain 'mudsillers.' " Bailey, "California, Japan, and the Alien Land Legislation of 1913," 1 Pac. Hist. Rev. 36, 57.

[15] The California State Board of Control collected statistics in 1920 as to city lots and farm lands occupied by Orientals, both American citizens and aliens. Of the total of 27,931,444 acres of farm land in the state, Japanese owned 74,769 acres, Chinese owned 12,076 acres and Hindus owned 2,099 acres. At the same time, Japanese held under lease or crop contract 383,287 acres, Chinese held 65,181 acres and Hindus held 86,340. There was no indication that any other aliens then ineligible for citizenship held any substantial amount of farm lands. Report, California and the Oriental (1920), p. 47.

[16] These statistics have been compiled by the petitioner (Appendix B of brief in this Court) from the biennial reports of the California Attorney General's Office from 1912–14 through 1944–46, as supplemented by the state's brief in this case (p. 47).

662

effective anti-Japanese propaganda.[17]  Vigorous enforcement of the Alien Land Law has been but one of the cruel discriminatory actions which have marked this nation's treatment since 1941 of those residents who chanced to be of Japanese origin.

The Alien Land Law, in short, was designed to effectuate a purely racial discrimination, to prohibit a Japanese alien from owning or using agricultural land solely because he is a Japanese alien.  It is rooted deeply in racial, economic and social antagonisms.  The question confronting us is whether such a statute, viewed against the background of racism, can mount the hurdle of the equal protection clause of the Fourteenth Amendment. Can a state disregard in this manner the historic ideal that those within the borders of this nation are not to be denied rights and privileges because they are of a particular race?  I say that it cannot.

The equal protection clause is too clear to admit of any other conclusion.  It provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  The words "any person" have

[17] In 1944 the Attorney General of California explained that the substantial non-enforcement of the law prior to World War II was "a reflection of the National policy to refrain from acts which might be regarded as unfriendly to the Japanese race and the Japanese empire."  Proceedings, California Land Title Association (38th Ann. Conf. 1944), p. 97.  Such was also the reason given by a California Senate Fact Finding Committee on Japanese Resettlement (Report of May 1, 1945), p. 3: "The Federal authorities since the beginning have not looked with favor upon the enforcement of the law just as they opposed its enactment in the beginning.  The principal reason for this attitude appears to have been that expressed by William Jennings Bryan when, as Secretary of State, he came to California in opposition to the enactment of this law.  He stated that the enactment of the law might turn a now friendly Nation into an unfriendly Nation.  Undoubtedly the attitude of the Federal authorities on this matter has been an important influence."

sufficient scope to include resident aliens, whether eligible for citizenship or not. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Truax* v. *Raich,* 239 U. S. 33. Hence Japanese aliens ineligible for citizenship must be accorded equal protection. And the laws as to which equal protection must be given certainly include those protecting the right to engage in common occupations like farming, *Yick Wo* v. *Hopkins, supra,* and those pertaining to the use and ownership of agricultural lands, *Buchanan* v. *Warley,* 245 U. S. 60. The concept of equal protection, however, may in rare cases permit a state to single out a class of persons, such as ineligible aliens, for distinctive treatment. The crucial test in these exceptional instances is whether there is a rational basis for the particular kind of discrimination involved. Are the characteristics of the class such as to provide a rational justification for the difference in treatment?

Such a rational basis is completely lacking where, as here, the discrimination stems directly from racial hatred and intolerance. The Constitution of the United States, as I read it, embodies the highest political ideals of which man is capable. It insists that our government, whether state or federal, shall respect and observe the dignity of each individual, whatever may be the name of his race, the color of his skin or the nature of his beliefs. It thus renders irrational, as a justification for discrimination, those factors which reflect racial animosity. Yet the history of the Alien Land Law shows beyond all doubt that factors of that nature make up the foundation upon which rests the discrimination established therein. And such factors are at once evident when the legal, social and economic considerations advanced in support of the discrimination are subjected to rigid scrutiny.

*First.* It is said that the rule established by Congress for determining those classes of aliens who may become

664

citizens furnishes in and of itself a reasonable basis for the discrimination involved in the Alien Land Law.

The proposition that the "plenary" power of Congress over naturalization is uninhibited, even by the constitutional prohibition of racism, is one that is open to grave doubts in my mind.[18] Racism has no justifiable place whatever in our way of life, even when it appears under the guise of "plenary" power. Cf. concurring opinion in *Bridges* v. *Wixon*, 326 U. S. 135, 161–162. But the fact remains that Congress has made racial distinctions in establishing naturalization standards. And those distinctions in large part have grown out of the demands of racially intolerant groups, including many of those who were among the foremost proponents of the Alien Land Law. Yet it does not follow, even if we assume that Congress was justified in adopting such racial distinctions, that California can blindly adopt those distinctions for the purpose of determining who may own and enjoy agricultural land. What may be reasonable and constitutional for Congress for one purpose may not be reasonable or constitutional for a state legislature for another and wholly distinct purpose. Otherwise there would be few practical limitations to the power of a state to discriminate among those within its jurisdiction, there being a plethora of federal classifications which could be copied.[19]

In other words, if a state wishes to borrow a federal classification, it must seek to rationalize the adopted distinction in the new setting. Is the distinction a reasonable one for the purposes for which the state desires to

---

[18] See Gordon, "The Racial Barrier to American Citizenship," 93 U. of Pa. L. Rev. 237.

[19] See *Arrowsmith* v. *Voorhies*, 55 F. 2d 310, holding invalid a Michigan statute which prohibited "undesirable aliens," as defined by the laws of the United States, from establishing or maintaining legal residence in that state or from securing employment in that state. See also *Hines* v. *Davidowitz*, 312 U. S. 52.

use it? To that question it is no answer that the distinction was taken from a federal statute or that the distinction may be rationalized for the purpose for which Congress used it. The state's use of the distinction must stand or fall on its own merits. And if it appears that the equal protection clause forbids the state from using the distinction for the desired purpose, the fact that Congress is free to adopt the distinction in some other connection gives the state no additional power to act upon it. Thus the state acquires no power whatever to impose racial discriminations upon resident aliens from the Congressional power to exclude some or all aliens on a racial basis.

*Second.* It is said that eligibility for American citizenship is inherently related to loyal allegiance and desire to work for the success and welfare of the state, which has a vital interest in the farm lands within its borders. Hence it may limit the ownership and use of farms to those who are or who may become citizens.

Such a claim is outlawed by reality. In 1940 there were 4,741,971 aliens residing in the continental United States, of whom 48,158 were ineligible for naturalization.[20] Many of these ineligible aliens have long been domiciled in this country. They have gone into various businesses and professions. They have established homes and reared children, who have the status of American citizens by virtue of their birth in this country. And they have entered into the social and religious fabrics of their communities. Such ineligible aliens thus have a vital interest in the economic, social and political well-being of the states in which they reside and their loyalty has been

---

[20] Of the 48,158 aliens ineligible for naturalization, 47,305 were Japanese, 749 were Korean, 9 were Polynesian, and 95 belonged to other Asiatic groups. 16th Census of the United States: 1940, Characteristics of the Nonwhite Population, p. 2.

proved many times.[21]  The fact that they are ineligible for citizenship does not, by itself, make them incapable of forming these ties and interests.  Nor does their ineligibility necessarily preclude them from possessing the loyalty and allegiance which the state rightly desires.

Loyalty and the desire to work for the welfare of the state, in short, are individual rather than group characteristics.  An ineligible alien may or may not be loyal; he may or may not wish to work for the success and welfare of the state or nation.  But the same can be said of an eligible alien or a natural born citizen. It is the essence of naïveté to insist that these desirable characteristics are always lacking in a racially ineligible alien, whose ineligibility may be remedied tomorrow by Congress.[22]  These are matters which depend upon factors far more subtle and penetrating than the prevailing naturalization standards.  As this Court has said, "Loyalty is a matter of the heart and mind, not of race, creed, or color." *Ex parte Endo,* 323 U. S. 283, 302.  And so racial eligibility for citizenship is an irrational basis for determining who is loyal or who desires to work for the welfare of the state.

*Third.* It has been said that if ineligible aliens could lease or own farms, it is within the realm of possibility that they might acquire every foot of land in California which is fit for agriculture.

---

[21] There was no indication of any sabotage or other subversive activities in the period surrounding Pearl Harbor on the part of Japanese aliens long resident in this country.

[22] Thus see the recent amendment to the Naturalization Act, 56 Stat. 182, 8 U. S. C. § 1001, permitting the naturalization of every person who honorably served in the armed forces of the United States during World War II without regard to what would otherwise be racial ineligibility.  Presumably a Japanese alien could own or use farm land in California if he meets the requirements of this provision.

If we assume that it is wrong for ineligible aliens to own or use all the farm land in California, such a contention is statistically absurd.[23]   The Japanese population in California, both citizen and alien, has increased from 41,356 (more than one-tenth of them citizens) in 1910 to 71,952 (about one-third of them citizens) in 1920 to 93,717 (about two-thirds of them citizens) in 1940.   Of the total farms in California in 1920, Japanese citizens and aliens controlled 4.4%, comprising 1.2% of the total acreage. In 1930 they controlled 2.9% of the farms, or 0.6% of the acreage.   And in 1940 they controlled 3.9% of the farms, or 0.7% of the acreage.   Since we are concerned here only with the Japanese aliens, the percentage of the farms and acreage controlled by them is materially less than the foregoing figures.   Thus the possibility of all the California farm land falling under the control of Japanese aliens is quite remote, to say the least.

Moreover, the nature of the Japanese alien segment of the California population is significant.   In 1940 there were 33,569 Japanese aliens in that state, but the number is now smaller, the best estimate being about 25,000.[24] The 33,569 figure represents those who entered before 1924, when Congress prohibited further immigration of aliens ineligible for citizenship.[25]   By 1940, all but 2,760 of these individuals were 35 years of age or older.   More than half of them were 50 years or more in age.   These age figures have risen to 43 and 58 during the past eight years and death is beginning to take a more rapid toll. Deportation, voluntary return to Japan and departure

---

[23] The statistics which follow are taken from the 16th Census of the United States: 1940, Characteristics of the Nonwhite Population.   See also McGovney, "The Anti-Japanese Land Laws of California and Ten Other States," 35 Calif. L. Rev. 7, 15–16.

[24] McGovney, "The Anti-Japanese Land Laws of California and Ten Other States," 35 Calif. L. Rev. 7, 14.

[25] 43 Stat. 161, 8 U. S. C. § 213 (c).

to other states have also contributed to the decline. The number of these aliens decreased 42% between 1920 and 1940 and an ever-increasing loss is inevitable.

Further deductions from this declining total of Japanese aliens must be made, for our purposes, for men and women who are engaged in non-agricultural activities. In 1940 about 58% of them resided in urban centers of 2,500 population or more. Out of 23,208 alien Japanese, fourteen years of age or older, only 10,512 were reported as engaged in farming occupations. While the Alien Land Law has undoubtedly discouraged some from becoming farmers, the number who would normally be non-farmers remains relatively substantial. The farmers, actual and potential, among this declining group are numerically minute.

One other fact should be mentioned in this connection. "Many of these aged and aging Japanese aliens suffered heavy pecuniary losses incident to their evacuation during the war. Suddenly ordered to abandon their properties and their homes, many felt compelled to sell at sacrificial prices. Others lost through unfaithful custodianship of their properties during their absence. Confined to so-called relocation centers, they were cut off for nearly three years from any gainful employment. The result is that many of the well-to-do among them returned to California broken in fortune, with very few years of life left for financial recuperation." [26]

Such is the nature of the group to whom California would deny the right to own and occupy agricultural land. These elderly individuals, who have resided in this country for at least twenty-three years and who are constantly shrinking in number, are said to constitute a menace, a "yellow peril," to the welfare of California.

[26] McGovney, "The Anti-Japanese Land Laws of California and Ten Other States," 35 Calif. L. Rev. 7, 16–17.

They are said to be encroaching on the agricultural interests of American citizens. They are said to threaten to take over all the rich farm land of California. They are said to be so efficient that Americans cannot compete with them. They are said to be so disloyal and so undesirous of working for the welfare of the state that they must be denied the right to earn a living by farming. The mere statement of these contentions in the context of the actual situation is enough to demonstrate their shallowness and unreality. The existence of a few thousand aging residents, possessing no racial characteristic dangerous to the legitimate interests of California, can hardly justify a racial discrimination of the type here involved.

*Fourth.* It is stated that Japanese aliens are so efficient in their farming operations and that their living standard is so low that American farmers cannot compete successfully with them. Their right to own and use farm lands must therefore be denied if economic conflicts are to be avoided.

That Japanese immigrants brought with them highly developed techniques of cultivation is not to be denied. In Japan they had learned to obtain the highest possible yield from each narrow strip of soil. And they possessed the willingness and ability to perform the great amount of labor necessary for intensive farming. When they came to California they put their efficient methods into operation. There they pioneered in the production of various crops and reclaimed large areas, developing some of the richest agricultural regions in the state. In performing these tasks, however, the Japanese caused no substantial displacement of American farmers. The areas which they cultivated were, for the most part, deserted or undesired by others.[27]

---

[27] McWilliams, Prejudice (1944), pp. 79–80.

But eventually, the Japanese concentrated all of their agricultural efforts in the production of vegetables, small fruits and greenhouse products, experience having shown that they could not compete successfully in larger farming endeavors. Within this truck-farm sphere, the Japanese achieved a near-monopoly by their diligence and efficiency. While they had, as we have seen, an infinitesimal proportion of the total farm acreage in California, their 1941 truck crops covered 42% of the state's acreage devoted to such production.[28] In Los Angeles County alone, they raised 64% of the truck crops for processing and 87% of the vegetables for fresh marketing.[29] This concentration of effort by the Japanese, many of whom were not aliens, naturally gave strong competition to other producers and forced some of them out of the field.

The success thus achieved through diligence and efficiency, however, does not justify prohibiting the Japanese from owning or using farm lands. Free competition and the survival of the fittest are supposedly vital elements in the American economic structure. And those who are injured by the fair operation of such elements can make no legitimate objection. It would indeed be strange if efficiency in agricultural production were to be considered a rational basis for denying one the right to engage in that production. Certainly from a constitutional standpoint, superiority in efficiency and productivity has never been thought to justify discrimination.

---

[28] H. R. Rep. No. 2124, 77th Cong., 2d Sess., pp. 117–118. In 1941 the Japanese produced 90% or more of California's snap beans for marketing, spring and summer celery, peppers and strawberries; 50% to 90% of the artichokes, snap beans for canning, cauliflower, fall and winter celery, cucumbers, fall peas, spinach and tomatoes; 25% to 50% of the asparagus, cabbage, cantaloupes, carrots, lettuce, onions, and watermelons.

[29] Id., p. 118.

Comparatively speaking, the standard of living of the Japanese immigrants may have been low at first. But they have worked to raise their standard despite such obstacles as the Alien Land Law. Like many other first-generation immigrants, the Japanese were often forced to work long hours for low pay. Yet nothing has indicated that, given a fair opportunity, they are incapable of improving their economic status. At the very least, a low standard of living is hardly a justification for a statute which operates to keep that standard low. Something more than its own bootstraps is needed to pull such a law up to the constitutional level.

*Fifth.* Closely knit with the foregoing are a host of other contentions which make no pretense at concealing racial bigotry and which have been used so successfully by proponents and supporters of the Alien Land Law. These relate to the alleged disloyalty, clannishness, inability to assimilate, racial inferiority and racial undesirability of the Japanese, whether citizens or aliens. The misrepresentations, half-truths and distortions which mark such contentions have been exposed many times and need not be repeated here. See dissenting opinion in *Korematsu* v. *United States,* 323 U. S. 214, 236–240. Suffice it to say that factors of this type form no rational basis for a statutory discrimination.

Unquestionably there were and are cultural, linguistic and racial differences between Japanese aliens and native Americans not of Japanese origin or ancestry.[30] The physical characteristics of the Japanese, their different customs and habits, their past connections with Japan, their unique family relationships, their Oriental religion, and their extreme efficiency all contributed to the social and economic conflicts which unfortunately developed. But the crucial mistake that was made, the mistake

---

[30] See McWilliams, Prejudice (1944), ch. III.

that made the attitude of many Americans one of intolerance and bigotry, was the quick assumption that these differences were all racial and unchangeable.  From that mistake it was an easy step to charge that the Japanese race was undesirable and that all Japanese persons were unassimilable.  And from that mistake flowed the many proposals to deal with the social and economic conflicts on a group or racial basis.  It was just such a proposal that became the Alien Land Law.

Hence the basic vice, the constitutional infirmity, of the Alien Land Law is that its discrimination rests upon an unreal racial foundation.  It assumes that there is some racial characteristic, common to all Japanese aliens, that makes them unfit to own or use agricultural land in California.  There is no such characteristic.  None has even been suggested.  The arguments in support of the statute make no attempt whatever to discover any true racial factor.  They merely represent social and economic antagonisms which have been translated into false racial terms.  As such, they cannot form the rationalization necessary to conform the statute to the requirements of the equal protection clause of the Fourteenth Amendment.  Accordingly, I believe that the prior decisions of this Court giving sanction to this attempt to legalize racism should be overruled.[31]

Added to this constitutional defect, of course, is the fact that the Alien Land Law from its inception has proved an embarrassment to the United States Government. This statute has been more than a local regulation of internal affairs.  It has overflowed into the realm of foreign policy; it has had direct and unfortunate conse-

---

[31] *Terrace* v. *Thompson*, 263 U. S. 197; *Porterfield* v. *Webb*, 263 U. S. 225; *Webb* v. *O'Brien*, 263 U. S. 313; *Frick* v. *Webb*, 263 U. S. 326.

quences on this country's relations with Japan. Drawn on a background of racial animosity, the law was so patent in its discrimination against Japanese aliens as to cause serious antagonism in Japan, even to the point of demands for war against the United States. The situation was so fraught with danger that three Presidents of the United States were forced to intervene in an effort to prevent the Alien Land Law from coming into existence. A Secretary of State made a personal plea that the passage of the law might turn Japan into an unfriendly nation. Even after the law became effective, federal authorities feared that enforcement of its provisions might jeopardize our relations with Japan. That fear was in large part responsible for the substantial non-enforcement of the statute prior to World War II. But the very existence of the law undoubtedly has caused many in Japan to bear ill-feeling toward this country, thus making friendly relations between the two nations that much more difficult.

Moreover, this nation has recently pledged itself, through the United Nations Charter, to promote respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language and religion. The Alien Land Law stands as a barrier to the fulfillment of that national pledge. Its inconsistency with the Charter, which has been duly ratified and adopted by the United States, is but one more reason why the statute must be condemned.

And so in origin, purpose, administration and effect, the Alien Land Law does violence to the high ideals of the Constitution of the United States and the Charter of the United Nations. It is an unhappy facsimile, a disheartening reminder, of the racial policy pursued by those forces of evil whose destruction recently necessitated a devastating war. It is racism in one of its most malignant forms. Fortunately, the majority of the inhabitants of the United

States, and the majority of those in California,[32] reject racism and all of its implications. They recognize that under our Constitution all persons are entitled to the equal protection of the laws without regard to their racial ancestry. Human liberty is in too great a peril today to warrant ignoring that principle in this case. For that reason I believe that the penalty of unconstitutionality should be imposed upon the Alien Land Law.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON joins, dissenting.

The Court's opinion assumes *arguendo* that the California Alien Land Laws are constitutional. As we read the opinion, it holds that the Alien Land Laws of California, as here applied, discriminate in an unconstitutional manner against an American citizen—a son born in the United States to resident parents of Japanese nationality. From this holding we dissent.

California, through an exercise of the police power, which has been repeatedly approved by us,[1] has prohibited ownership of land within the state by aliens ineligible for citizenship.[2] Recognizing that the benefits flowing from ownership can be enjoyed through subter-

---

[32] On November 5, 1946, the voters of California rejected by 1,143,780 to 797,067 an attempt to "close loopholes in legislative enactments [the Alien Land Laws] based on constitutional grounds." The rejected amendment validated various additions to the Alien Land Law which had been made by the legislature to prevent circumvention of that law. U. S. Dept. of Interior, W. R. A., People in Motion: The Postwar Adjustment of the Evacuated Japanese Americans (1947), pp. 41–45.

[1] See footnote 12 of the majority opinion.

[2] SEC. 1: "All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, use, cultivate, occupy, transfer, transmit and inherit real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof,

fuges by persons not the holders of legal or equitable title, California has proscribed as to the state every "conveyance . . . made with intent to prevent, evade or avoid escheat . . . ." [3] Transfers of real property made with

in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state."

SEC. 2: "All aliens other than those mentioned in section one of this act may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

SEC. 7: "Any real property hereafter acquired in fee in violation of the provisions of this act by any alien mentioned in Section 2 of this act, or by any company, association or corporation mentioned in Section 3 of this act, shall escheat as of the date of such acquiring, to, and become and remain the property of the State of California. . . ."

[3] SEC. 9: "Every transfer of real property, or of an interest therein, though colorable in form, shall be void as to the State and the interest thereby conveyed or sought to be conveyed shall escheat to the State as of the date of such transfer, if the property interest involved is of such a character that an alien mentioned in Section 2 hereof is inhibited from acquiring, possessing, enjoying, using, cultivating, occupying, transferring, transmitting or inheriting it, and if the conveyance is made with intent to prevent, evade or avoid escheat as provided for herein.

"A prima facie presumption that the conveyance is made with such intent shall arise upon proof of any of the following group of facts:

"(a) The taking of the property in the name of a person other than the persons mentioned in Section 2 hereof if the consideration is paid or agreed or understood to be paid by an alien mentioned in Section 2 hereof;

"(b) The taking of the property in the name of a company, association or corporation if the memberships or shares of stock therein held by aliens mentioned in Section 2 hereof, together with the memberships or shares of stock held by others but paid for or agreed or

this intent "shall be void as to the state and the interest thereby conveyed or sought to be conveyed shall escheat to the state as of the date of such transfer . . . ." To assist in the proof of "intent to prevent, evade or avoid escheat," the state was given the benefit of a "prima facie presumption that the conveyance is made with such intent . . ." where the state proves: "The taking of the property in the name of a person other than [an alien who cannot hold land] . . . if the consideration is paid or agreed or understood to be paid by an alien [who cannot hold land] . . . ." Thus the state has made void as to it, two substantive acts: (1) ownership of land by ineligible aliens and (2) transfers made to avoid by indirection the prohibition against ownership of land by ineligible aliens. The statutory scheme recognizes that the purpose of the Alien Land Laws cannot be achieved unless attempts to avoid the basic prohibition of the law are penalized. Any law aimed at the prevention of own-

---

understood to be paid for by such aliens, would amount to a majority of the membership or issued capital stock of such company, association or corporation;

"(c) The execution of a mortgage in favor of an alien mentioned in Section 2 hereof if such mortgagee is given possession, control or management of the property.

"In each of the foregoing instances the burden of proof shall be upon the defendant to show that the conveyance was not made with intent to prevent, evade or avoid escheat.

. . . . .

"The enumeration in this section of certain presumptions shall not be so construed as to preclude other presumptions or inferences that reasonably may be made as to the existence of intent to prevent, evade or avoid escheat as provided for herein."

Presumption (a) has not been challenged on due process grounds. Such an attack would be futile as there is a "rational connection between the fact[s] proved and the ultimate fact presumed." *Tot* v. *United States,* 319 U. S. 463, 467. In *Cockrill* v. *California,* 268 U. S. 258, this Court held that presumption (a) did not violate due process.

ership by ineligible aliens, which did not penalize both the act of owning and the act of attempting to enjoy the rights of ownership through a cloak, would be defective and readily avoided.

The trial court found that the transfers challenged by California in this case were made with an "intent to prevent, evade or avoid escheat"; in so finding the court considered the statutory presumption together with the other evidence detailed in the Court's opinion and concluded that the defendants had not met the statutory burden of proof imposed by § 9. The Supreme Court of California affirmed.

We do not have in this review a balancing of constitutional rights; on one hand, the right of California to exclude ineligible aliens from land ownership and, on the other, the right of their citizen sons to hold land. California does not deny the right to own land in California to a citizen son of an ineligible alien. If that citizen obtains the land in any way not made void as a violation of law, he may hold it. Under § 9 the land escheats because of the father's violation of law before it reaches the son. The denial to the father by California of the privilege of land ownership is not challenged. Neither is the right to protect that denial by an escheat of the land on the father's attempt to avoid the limitations of the California land law. Actually, the only problem is whether the presumption arising from the payment of money for land by the ineligible father denies equal protection of the law to the son. We understand the majority opinion to hold that presumption (a) of § 9, with its so-called ancillary inferences because of the son's minority and the father's failure to file guardianship reports or testify, as here applied, discriminates unconstitutionally against Fred Oyama. If that presumption, with the inferences, had been held constitutional, apparently the Court would have affirmed the opinion below because the issue then remain-

ing would have been the correctness of the findings of fact by the trial judge. No one would suggest that the correctness of those findings could be challenged here; the resolution of disputed issues of fact in non-constitutional matters is for the state judicial system. This Court does not intimate that it disagrees with California's factual conclusion. Its ruling is based on the "cumulative effect" of the "statutory presumption" and "two ancillary inferences." On remand to the courts of California, the case may be tried again. On that retrial all of the evidence admitted at the first trial may be submitted to the triers of fact for no one says that the items of evidence, including the father's payment of consideration, introduced by the state are inadmissible. A major vice of the state's application of the law apparently was the reliance upon a presumption and inferences that this Court holds deny equal protection. If an intent to "prevent, evade or avoid escheat" is found on the same evidence, an escheat will again take place.

Presumption (a) of § 9 has been construed by the California Supreme Court: "That if the consideration for the purchase of the real property is paid by an ineligible alien and the title is taken in the name of a third person, it will be presumed, in the absence of other evidence to the contrary, that it was the intent of both the alien and the grantee to 'prevent, evade or avoid' the escheat at law. . . . But the presumption is recognized as disputable and as disappearing in the face of contrary evidence of sufficient strength to meet our rule on conflict of testimony."[4] We do not interpret the opinion of our Brethren to say that the presumption, if valid, is irrebut-

---

[4] *People* v. *Fujita,* 215 Cal. 166, 170–71, 8 P. 2d 1011–12; see *Takeuchi* v. *Schmuck,* 206 Cal. 782, 276 P. 345. Indeed, a holding that this presumption was conclusive might open it to a serious attack based upon due process grounds. See *Heiner* v. *Donnan,* 285 U. S. 312.

table; or, to put the matter differently, that the effect of the presumption, if valid, is to make it inevitable that all gifts of real property by an alien-Japanese father to his child can be successfully escheated by the state. As the cases prove, an alien-Japanese father can give California lands to his son in spite of the presumption.[5] The effect of the presumption, if valid, is rather to place a burden, an "onerous burden" to adopt the phrase of the majority opinion, upon all grantees who take land under those conditions set forth in § 9.

The issue in this case, therefore, is neither the validity of the California prohibition against the ownership of agricultural land by a person ineligible to become an American citizen, nor the validity of a law, § 9, that an attempt to evade that prohibition shall be penalized by escheat. The validity of both of these provisions is unchallenged by this Court's opinion. The issue here is the validity of the presumption that when an ineligible person pays the consideration for land conveyed to an eligible person, there is a prima facie presumption that the conveyance is made to avoid the prohibited ownership. The essence of the argument in the opinion is this: When an alien-English father purchases land from a third party and puts title in his child, acceptance by the child and delivery of the deed are presumed; however, if an alien-Japanese father engages in the same transaction, his child must meet the "onerous burden" of the presumption; therefore, Fred Johnson and Fred Oyama are not treated equally by the laws of California and Fred Oyama is denied equal protection by those laws. These facts are accurate; the flaw is that the conclusion does not follow. California has, as against the state, made illegal a particular class of transactions: transfers made with the intent to evade escheat of lands. Anyone, no matter

[5] *People* v. *Fujita,* 215 Cal. 166, 8 P. 2d 1011; see *Estate of Yano,* 188 Cal. 645, 206 P. 995.

what his racial origin may be, who as a grantee is a party to a sale of land which the state attacks as being within the proscribed class must overcome the presumption of § 9 to establish the legality of the transfer. This presumption operates with a mechanical impartiality. Whoever the grantee in a transfer questioned by the state is, be he Fred Johnson or Fred Oyama, he must bear the "onerous burden"; he must bear it not because of descent or nationality but because he has been a party to a transaction which the state challenges as illegal under an admittedly valid law.

As we see the Court's argument, it focuses attention upon what it contends are two parallel situations: the gift of an English father to a citizen son and the gift of a Japanese father to a citizen son. Upon examination of the relevant state laws, it concludes that the son of the Japanese father is placed in a position less advantageous than that of the son of an English father. That is so, but for our purposes it is the reason for the result, and not the result itself, that is important. The legal positions of the two sons are different only because the situations are not parallel. The Japanese father and his citizen son are parties to an illegal transaction if the land was transferred with the "intent to prevent, evade or avoid escheat"; as an English father is not prevented from holding real property, his gift cannot be challenged on that ground by the state. The capacities of the donors are different and it is this difference, and nothing else, which raises in one case and fails to raise in the other, the presumption complained of by Oyama.[6] It is not a denial of equal protection for a state to classify transac-

---

[6] *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35, 42–43:

"Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, National and state, dealing with such methods of proof in both civil

tions readily leading to law evasions differently from those without such a possibility. Such classification is permissible.

Let us test the Court's reasoning by applying it to a different set of facts. For purposes of illustration, we put these cases: (1) a solvent father purchases land from a third party and puts the title in his son; and (2) an insolvent father purchases land from a third party and puts the title in his son. In example (2), the creditors of the father in an action against the son to subject the land to the satisfaction of their claims against the father, can raise a prima facie presumption that the transfer was fraudulent as to them by proving that the transaction took place during the period of the father's insolvency.[7] Here the son of the insolvent father bears an "onerous burden" to which the son of a solvent father is not subjected; he bears this burden because he has been a party to a transaction which creditors challenge as void-

---

and criminal cases abound, and the decisions upholding them are numerous. . . .

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed."

*Seaboard Air Line R. Co.* v. *Watson*, 287 U. S. 86, 90; *Bandini Co.* v. *Superior Court*, 284 U. S. 8, 18–19; *United States ex rel. St. Louis S. R. Co.* v. *I. C. C.*, 264 U. S. 64, 77.

[7] *Bailey* v. *Blackmon*, 3 F. 2d 252, 253, aff'd on rehearing, 14 F. 2d 16; *Hedrick* v. *Hockfield*, 283 F. 574, 576–77; *Ryan* v. *Wohl, South & Co.*, 241 Ala. 123, 124–25, 1 So. 2d 292, 293; *Judson* v. *Lyford*, 84 Cal. 505, 509, 24 P. 286, 287–288; *Swartz* v. *Hazlett*, 8 Cal. 118, 128; *Chrisman* v. *Greer*, 239 Ky. 378, 380, 39 S. W. 2d 678, 679; *Pruyn* v. *Young*, 51 La. Ann. 320, 322, 25 So. 125, 126; *Lusk* v. *Riggs*, 65 Neb. 258, 261, 91 N. W. 243, 244; *Grambling, Spalding & Co.* v.

able. The disability of the father taints the son's right and, therefore, he is placed in a position less advantageous than that of the son of a solvent father. Would it be reasonable to say that the son of the insolvent father has been denied "equal protection" and, consequently, the presumption is unconstitutional? No one would so contend. The inequality between the sons of eligible and ineligible landowners does not seem to us to differ.

As we understand petitioners' argument in briefs and before this Court, the petitioners in their discussion of the denial of equal protection to the citizen son depended solely upon the invalidity of the presumption arising from the payment of the money by the father. This Court's opinion recognizes that petitioners' argument includes discrimination, amounting to a lack of equal protection, arising (1) from the requirement of § 9 that the son must take the burden of proving affirmatively the bona fides of the gift from the father; (2) because the gift to the infant son of a Japanese is presumed invalid while the gift to an infant son of an eligible alien is presumed valid; (3) because the Court took into consideration the father's omission to file guardian reports after the transfer. Normally, the Court says, a guardian's subsequent improper conduct would not affect the validity of a gift to a child. Because of what is deemed additional burdens thus placed upon the son, the Court concludes that:

> "The cumulative effect, we believe, was clearly to discriminate against Fred Oyama. . . .

*Dickey,* 118 N. C. 986, 988, 24 S. E. 671, 672; *Willamette Grocery Co.* v. *Skiff,* 118 Ore. 685, 689, 248 P. 143, 144.

This analogy is exact because in most jurisdictions the fact of a blood relationship alone raises no presumption of fraud. *Gottlieb* v. *Thatcher,* 151 U. S. 271, 279; *Gray* v. *Galpin,* 98 Cal. 633, 635, 33 P. 725, 726. See cases collected in 27 C. J. 827, note 99; 37 C. J. S. 1084, note 9.

"The only basis for this discrimination against an American citizen, moreover, was the fact that his father was Japanese and not American, Russian, Chinese, or English."

These discriminations, if such they are, seem to us mere elaborations of the central theory that the challenged presumption of § 9 is unconstitutional as a denial of equal protection. It is of course true that the son of a citizen of Japan cannot receive a gift from an ineligible father as readily as a son of an alien entitled to naturalization but again such a classification is entirely reasonable when we once assume that the State of California has a right to prohibit the ownership of California land directly or indirectly by a Japanese.

Discrimination in the sense of placing more burdens upon some than upon others is not in itself unconstitutional. If all types of discrimination were unconstitutional, our society would be incapable of legislation upon many important and vital questions. All reasonable classification puts its subjects into different categories where they may have advantages or disadvantages that flow from their positions.[8] The grouping of all those who take land

---

[8] *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78–79:

"The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classifi-

as grantees, in a transaction in which an ineligible alien pays the consideration, in a class subject to the statutory presumption of § 9 and other inferences which are reasonably related to the transfer, should not be struck down as unconstitutional. Unless the California Land Laws are to be held unconstitutional, we think the presumption and its resulting effects must be accepted as legal.

Mr. Justice Jackson, dissenting.

I am unable to see how this Court logically can set aside this judgment unless it is prepared to invalidate the California Alien Land Laws, on which it is based. If this judgment of escheat seems harsh as to the Oyamas, it is only because it faithfully carries out a legislative policy, the validity of which this Court does not question.

The State's argument is as simple as this: If California has power to forbid certain aliens to own its lands, it must have incidental power to prevent evasion of that prohibition by use of an infant's name to cloak a forbidden ownership. If it has the right to protect itself against such evasion, its courts must have the right to decide the question of fact whether a given transaction constitutes an evasion. And if its courts have to apply the Act, the State has power to aid them by creating reasonable presumptions. I cannot find that this reasoning is defective or that it fails to support the judgment below, however little I like the result.

In this case the elder Oyama arranged to acquire some six acres of agricultural lands. He could not take title in his own name because of his classification as an ineligible alien, and hence one forbidden to acquire such lands.

---

cation in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

*Finley* v. *California*, 222 U. S. 28.

Title was taken in the name of Fred, his son. When this was happening Fred was six years old. He had no funds and the entire consideration was paid by the father. We can hardly criticize the state court for concluding, especially in absence of any proof to the contrary, that a 6-year-old child did not decide for himself to go into agriculture, or that these particular lands would be suitable for him if he did. The lands would require continuous cultivation if they were not to revert to a state of nature and it was not unreasonable to doubt that the 6-year-old son could supply either the manual labor or the oversight necessary to preserve the investment or to make it yield a return. Moreover, the return from the lands, even if applied to the support of young Oyama, operated to reduce the parental obligation. In short, there is no proof that this 6-year-old child contributed to the purchase of these lands either funds, judgment or desire. The California court considered that his name was used in the transaction without the infant's understanding consent. Even if there were no presumption created by statute, I should find it difficult to say that this conclusion is an unreasonable one.

Nor do I think we could say that it would offend the Federal Constitution if the State, to make admittedly constitutional legislation effective, should go so far as to create a presumption that where the consideration is paid by an ineligible father and the title is taken in the name of his infant son, it is to be deemed the father's purchase. I do not understand the Court to say that this is a far-fetched or unreasonable inference from such facts. It seems to say, however, that a presumption, which it construes in this way, is invalid because it operates only against sons of persons ineligible for citizenship. If even such a presumption strikes only a limited class, it is because the basic prohibitions of the Act strike only a lim-

ited class. If the State can validly classify certain Asiatics as a separate class for exclusion from land ownership, I do not see why it could not do so for purposes of a presumption.

But the California statute has not made a presumption applicable only against sons of the excluded Asiatics. The statutory presumption, so far as it applies here, is cast in this language:

"A prima facie presumption that the conveyance is made with such intent shall arise upon proof of any of the following group of facts:

"(a) The taking of the property in the name of a person other than the persons mentioned in Section 2 hereof [the excluded alien] if the consideration is paid or agreed or understood to be paid by an alien mentioned in Section 2 hereof . . . ."

The same presumption would be raised by the statute against any American citizen or any alien or any person whatsoever if he received the title and any ineligible alien paid the consideration. The Court's decision is that the presumption denies Fred Oyama the equal protection of the laws because grantees are treated differently if they are sons of ineligible aliens than if they are the sons of others. This Act makes no such classification. The presumption does not apply to him because he is the son of an ineligible father—it applies because he is a grantee of lands paid for by an ineligible alien. The Court itself reads this father and son classification into the Act, quite unjustified by its words. It is true that in this case the relationship of father and son also exists, but that is not the relationship that calls the presumption into operation.

The Act classifies grantees only as those whose lands have been paid for by an ineligible alien and those whose lands have not. Every member of the class whose lands have been paid for by such an alien must overcome the

presumption. Every grantee similarly situated is saddled by the identical burden imposed on Fred Oyama whether he is the son of a Japanese, the son of an American citizen or the son of an eligible alien. Thus there is no discrimination apparent on its face in the provision of the statute which the Court strikes down.

But it is said that a discrimination is latent in this presumption from the fact that other fathers may give land to their sons and no presumption would apply. That there is a discrimination in this situation no one will deny; it is the fundamental one, which the Court does not touch, by which the elder Oyama could not, directly or indirectly, acquire this land while many other fathers could. The presumption, of course, would not apply if the consideration were paid by a person to whom the statute does not apply. But Fred Oyama, the son, is in no different position as to the presumption than the son of any other person whatsoever. If a citizen's son received this land from Oyama, Senior under the same conditions, he would be confronted with the same presumption and escheat. If the Oyama lad, on the other hand, received this land from a citizen, he would take it as free of presumption and escheat as any California lad could do. The only discrimination which prejudices young Oyama is the one which makes his father ineligible to own land or be a donor of it. That discrimination is passed by as valid, and one that seems to me wholly fictitious is first erected by this Court and then struck down.

I do not find anything in the Federal Constitution which authorizes us to strip a State of its power to enact reasonable presumptions which put the burden of producing evidence upon the only person who possesses it. This presumption is not made conclusive and the California courts have sometimes held it to be overcome by evidence. In this case, if there is any explanation of this transaction other than that Oyama used his son's

name to acquire beneficial interests for himself which he was forbidden to acquire in his own name, no one knows those facts better than the senior Oyama. He did not take the witness stand. He left unrebutted both the presumption of the statute and the inference that most reasonable persons, even in the absence of a statute, would draw from the facts.

This Court also says that California used the default of the father, in failing to file accountings as trustee for the infant, as evidence against the infant and seems to imply this was an unconstitutional procedure. As we have seen, this infant was of such tender years that he had neither ideas nor will nor understanding about the purchase. The only person's intention which would stamp this transaction as one in good faith or as an evasion of the statute was the intention of the father. He was the only actor; he gave the land to the son and accepted on his behalf, so we are told. Certainly it was competent for the California courts, as bearing on his intentions and good faith, to receive evidence of the fact that the sole actor did not consider himself under an obligation to account as the law would require him to do if the property really belonged to an infant and he were a trustee.

While I think that California has pursued a policy of unnecessary severity by which the Oyamas lose both land and investment, I do not see how this Court, while conceding the State's right to keep the policy on its books, can strip the State of the right to make its Act effective. What we seem to be holding is that while the State has power to exclude the alien from land ownership, the alien has the constitutional right to nullify the policy by a device we would be prompt to condemn if it were used to evade a federal statute.

A majority of the Court agrees that the ground assigned by the Court's opinion is sufficient to decide this litigation.

It does not therefore seem necessary or helpful to enter into a discussion of the constitutionality of the Alien Land Laws themselves.